NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2338-12T1

R.K. and A.K.,[1]

    Plaintiffs-Appellants,

v.

D.L., JR.,

    Defendant-Respondent.

---

| APPROVED FOR PUBLICATION |
| :---: |
| **January 13, 2014** |
| **APPELLATE DIVISION** |

Argued December 11, 2013 — Decided January 13, 2014

Before Judges Fuentes, Fasciale and Haas.

On appeal from Superior Court of New Jersey,
Chancery Division, Family Part, Bergen County,
Docket No.  FD-02-387-13.

Martin J. Arbus argued the cause for appellants
(Arbus, Maybruch & Goode, LLC, attorneys;
Mr. Arbus and Matthew R. Goode, on the briefs).

Amy F. Gjelsvik argued the cause for respondent
(Daggett, Kraemer & Gjelsvik, attorneys;
Ms. Gjelsvik, on the brief).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

---

[1] To protect the identity of the twelve-year-old child, the court has chosen to use initials for the parties.

Plaintiffs R.K. and A.K. are the maternal grandparents of twelve-year-old Olga.[2] Plaintiffs filed a verified complaint in the Family Part seeking visitation rights with their granddaughter pursuant to our State's grandparent visitation statute, N.J.S.A. 9:2-7.1.

After joinder of issue, but before the parties engaged in any discovery, the child's father, defendant D.L., Jr., filed a motion to dismiss the complaint under Rule 4:6-2(e), for failure to state a claim upon which relief can be granted. The court granted defendant's motion and dismissed plaintiffs' cause of action without conducting an evidentiary hearing or affording counsel for either side the opportunity to present oral argument. The court based its decision to dismiss this case on plaintiffs' failure to provide expert testimony. The court thereafter denied plaintiffs' motion for reconsideration, although on that occasion it afforded counsel the opportunity to present oral argument on the matter.

Plaintiffs now appeal arguing the Family Part erred when it dismissed their complaint before they had the opportunity to engage in discovery or present evidence in an evidentiary hearing. Plaintiffs also argue the court misapplied the

---

[2] We have fictionalized the names of the children for ease of reference.

standard applicable for deciding a motion brought under Rule 4:6-2 because the allegation raised in their complaint, together with the certifications submitted in response to defendant's motion to dismiss, were sufficient to establish a prima facie cause of action under N.J.S.A. 9:2-7.1, and raised material questions of fact that can only be resolved through an evidentiary hearing.

We agree with plaintiffs' arguments and reverse. The facts alleged by plaintiffs in their complaint and supplemental certifications established a prima facie case for relief under N.J.S.A. 9:2-7.1. Moreover, because the court decided defendant's Rule 4:6-2(e) motion after it considered factual allegations made by the parties in certifications outside the pleadings, it was required to apply the standard governing summary judgment motions in Rule 4:46-2(c). Roa v. Roa, 200 N.J. 555, 562 (2010). The court erred in granting defendant's motion to dismiss because the record shows the parties have clear disagreements concerning the nature and significance of key events in their lives. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995); R. 4:46-2(c). Most importantly, the parties' disagreements are rooted in their seemingly irreconcilable perceptions of how these tragic events have affected Olga's emotional wellbeing.

Given the complexity and magnitude of the tragic facts alleged here, the court also erred by dismissing plaintiffs' complaint without affording them the opportunity to conduct discovery in order to gather sufficient evidence to overcome defendant's presumptively valid objection to grandparent visitation as Olga's father. Once discovery is completed, the court may then entertain the filing of dispositive motions, if warranted by the evidence. If motion practice proves to be an unsuitable means for resolving this dispute, the court must then conduct a plenary hearing to assess the credibility of witnesses' testimony, after they have been subjected to rigorous cross-examination.

Finally, the court also erred in concluding plaintiffs were required to present expert testimony to meet their burden of proof in this case. Grandparents can meet their burden of proof that regular contact with their grandchild is necessary to avoid harm to the child without presenting expert testimony. As our Supreme Court noted in Moriarty v. Bradt, 177 N.J. 84, 117 (2003), cert. denied, 540 U.S. 1177, 124 S. Ct. 1408, 158 L. Ed. 2d 78 (2004), "[t]he grandparents' evidence can be expert or factual." It was also unfair for the trial court to base its decision to dismiss plaintiffs' case based in large part on their failure to produce expert testimony, while the case was at

its most embryonic phase and after denying them the opportunity to engage in discovery.

We gather the following facts from the pleadings and the certifications submitted by the parties in support of and in opposition to plaintiffs' motion for reconsideration.

I

UNDERLYING FACTS

Defendant was twenty-five years old at the time he met plaintiffs' twenty-one-year-old daughter K.K. Defendant was introduced to K.K. by her brother, who was also defendant's roommate at the time. The couple lived together for a period of time before they eventually married in 2000. They had two children, Olga born in 2001 and Charles born in 2004.

Plaintiffs acknowledge that their daughter was addicted to pain medication at the time she married defendant. Plaintiffs also claim, however, that defendant knew of her addiction before the wedding and agreed to help her overcome it. K.K. was originally prescribed this medication to alleviate the pain she suffered as a result of being seriously injured in a car accident years earlier. Plaintiffs' younger son was killed in this same accident. He was a passenger in the car driven by K.K.

A-2338-12T1

According to defendant, K.K.'s drug abuse issues predated the automobile accident. In his certification submitted in support of his motion to dismiss plaintiffs' complaint, defendant averred that in the course of his divorce he "learned for the first time that [K.K.] started experimenting with drugs at age 13." Defendant believes the car accident served only to exacerbate K.K.'s preexisting drug abuse problem because she abused pain medication as a misguided effort "to self-medicate against her emotions related to the guilt and loss of her brother."

The marriage between defendant and K.K. lasted only four and one-half years. The couple separated in 2004; the court entered a final judgment of divorce in August 2006. Ostensibly driven by his concern over K.K.'s addiction, defendant fought hard to obtain physical custody of the children pendente lite. However, in August 2005, the matrimonial court awarded K.K. physical custody of the children, although both parents were given joint legal custody.

Based on the record before us, it seems clear defendant still resents plaintiffs for the role they played in the court's custody decision. In defendant's view, the matrimonial judge was heavily, if not unduly influenced by plaintiffs' assurances that they would be available to help their daughter with the

care and supervision of the children because she and the children would reside with plaintiffs in their house in Howell.

As a result, commencing in August 2005, plaintiffs shared their home with their daughter and grandchildren. This arrangement continued for six years, until plaintiffs relocated to Florida in April 2011. From plaintiffs' perspective, the time they spent with their granddaughter, during the formative years of this child's life, enabled them to forge a strong, close, and loving relationship with her. Defendant sees this arrangement very differently. In his view, plaintiffs merely meddled in his family's affairs, undermined his parental role and authority over his two children, and most importantly, in retrospect, left his infant son in the hands of a drug-addicted, emotionally unstable woman who proved to be utterly incapable of keeping him safe.

The animosity between defendant and plaintiffs engendered by the court's custody decision reached a critical point on November 14, 2005, the day eighteen-month-old Charles tragically drowned in a koi pond located in the backyard of plaintiffs' house in Howell. Plaintiffs described the circumstances surrounding their grandson's death in paragraphs 25 and 26 of their verified complaint:

> [E]veryone was at home and asleep after
> spending the entire night in the emergency

room due to a medical issue suffered by [plaintiff R.K.] during the course of the evening.[3] The parties awoke in the morning with the screams of [K.K.] that she could not find [Charles]. It was later determined that [Charles] had apparently slipped out of the house into the backyard and had fallen into a fish pond and drowned. The fish pond was only one foot deep. The matter was thereafter investigated by both the Monmouth County Prosecutor's Office and Howell Police Department and both determined this was a "tragic accident." Everyone was devastated by the loss of [Charles].

Following the death of [Charles], defendant served [K.K.] with papers for sole custody of [Olga]. The same judge that made the original decision regarding physical custody, again gave primary custody of [Olga] to [K.K.] in early December of 2006.

Despite evidence indicating otherwise, defendant still holds plaintiffs in large part responsible for Charles' death. The following passage from his certification captures the essence and depth of defendant's feelings in this regard.

I am a reasonable man and understand in life accidents happen but my son's death was more than avoidable had the Plaintiffs simply fulfilled the responsibility they begged for. The police report states that [Charles] had drowned and was under water for approximately 20 minutes. To me that

---

[3] Defendant claimed in his certification to the trial court that the medical emergency suffered by R.K. that night was caused by a chronic alcohol abuse problem. Plaintiff A.K. denied this allegation in her response certification in support of plaintiffs' motion for reconsideration. She claimed her husband suffered an acute case of acid reflux, which initially mimics the symptoms of cardiac arrest.

means [Charles] was out of the house navigated the stairs, wandered the yard for an undocumented amount of time until he happened upon the unfenced koi pond and fell in. Being only 18-months old, [Charles] required constant supervision, as do all toddlers. Knowing that [K.K.] was battling her drug addiction and my concern for the children's safety, the [Ks] promised the Courts to supervise her parenting time. Where were the [Ks] while [Charles] was escaping the house, wandering the yard, drowning in the pond and lifeless for another 20 minutes?[4]

Following Charles' death, defendant filed a wrongful death action against plaintiffs alleging negligent supervision as the ground for liability. According to A.K., she and her husband agreed to settle the case because their home insurance carrier assured them that: (1) the settlement did not constitute an admission of liability on their part: and (2) half of the settlement proceeds would be paid to their daughter as Charles' mother.

Simultaneous with the wrongful death action, defendant filed an emergent application before the Family Part to obtain physical custody of Olga, alleging his son's death was indicative of K.K.'s unfitness to parent Olga or be responsible

---

[4] Plaintiffs denied defendant's allegations concerning the circumstances that led to Charles' death. Specifically, A.K. submitted a rebuttal certification before the trial court in which she averred that Charles was only "missing a total of 10-11 minutes."

for her welfare and safety. Defendant also claimed plaintiffs failed to honor the assurances they made to the matrimonial court that induced the judge to award physical custody of the children to their daughter. Despite this tragic event and the serious nature of defendant's allegations, the Family Part denied defendant's motion for a change in physical custody and continued plaintiffs' involvement in Olga's life.

It appears the court's decision to deny defendant custody of Olga following the death of his son continues to vex defendant and invoke in him a strong emotional reaction. Once again we cite to defendant's certification:

> For reasons unbeknownst to me, my emergent request for custody of [Olga] was rejected and the Judge simply stated he didn't want to place blame for [Charles'] death at that time. <u>I simply wanted my right as a father to protect my daughter from any further harm and prevent her from suffering the same fate as her brother</u>. (Emphasis added).

We pause to note that the record before the Family Part, and later provided to us in this appeal, does not contain any evidential support for holding plaintiffs responsible for Charles' tragic death. Yet, eight years after the child's death, defendant continues to blame plaintiffs for this tragic accident.

Plaintiffs decided to relocate to Florida in November 2009, but permitted K.K. to remain living with Olga in their home in

Howell. As represented in paragraph 28 of their verified complaint, plaintiffs kept in daily telephone contact with their daughter and granddaughter. They also returned to New Jersey in 2010 to spend the Christmas holiday with their entire family, which included their two other sons and their wives and children, including five of Olga's maternal cousins. Plaintiffs returned to Florida on December 31, 2010, and continued to call Olga and K.K. on a daily basis.

A reasonable person can view the events recounted thus far as constituting more than a lifetime worth of suffering for both sides of this family dispute. However, another great and tragic loss awaited in 2011. As revealed in paragraph 29 of the verified complaint, in early February 2011, K.K. called her mother and told her, in an alarmed fashion, that "she felt a pop in her chest." Although A.K. advised her daughter to see a doctor or go to a clinic, she never did. Plaintiffs described what followed this event on paragraph 30 of their verified complaint.

> On March 7, 2011, [A.K.] received a call from [Olga] that she had come home from school and found her mother unconscious in the bedroom. [A.K.] told [Olga] to stay on the phone and [A.K.] called Howell Police. She also called their eldest son, [R.K.], who lived in Marlboro, New Jersey to drive over to be with [Olga]. The ambulance and police arrived at the home and [A.K.] spoke to a female officer to tell her that her son

11

was on the way to be with [Olga]. Plaintiffs were advised that [K.K.] was breathing but unconscious and they needed to take [Olga] to the police station unless their son could get there before the ambulance left. Plaintiffs' son [R.K.], did arrive in time and [Olga] was released to his home in Marlboro. That evening [defendant] went to [R.K.'s] home and picked [Olga] up from the home.

K.K. was diagnosed with "a heart valve problem." She was admitted to two separate hospitals for a period of four weeks. Her mother A.K. kept in constant telephone contact with her daughter in New Jersey until she flew from Florida on March 10, 2011. According to plaintiffs, defendant only allowed Olga to call her mother on the phone two times during her month-long stay at Robert Wood Johnson Medical Center in New Brunswick. He did not allow Olga to visit her mother during the entire four-week period of her hospitalization.

K.K. had heart surgery at Robert Wood Johnson sometime in the last week of March 2011. Although she seemed to be doing well approximately a week after her surgery, K.K. died at six o'clock in the morning on April 2, 2011. Her brother R.K. notified defendant, who, according to plaintiffs, responded via a text message "stating he was simply leaving the issue of [Olga's] attendance at the funeral to [Olga] and that he was not going to sway her either way." Defendant allegedly followed

this initial text message with a second text stating the following:

> [Olga] and I will be coming for the private viewing. I want her to be encouraged to only stay a short time. She will not leave my sight. I don't want her to know any details other than her mom's heart was sick and the doctors did everything they could and lastly, I don't want any discussion about how she is to call to talk to you in the future as that is what you and I will discuss in the days ahead. If she asks simply say, we will talk and text soon, you and I will work those details out later. . . .

Despite the curtness of this message, plaintiffs claimed that when defendant appeared at the funeral "everyone hugged and plaintiffs told [defendant] they still loved him and he was like a son to them during the marriage." According to plaintiffs, Olga ran and hugged her grandmother as soon as she came out of the car at the funeral and never left her grandmother's side "as they went to see her mother." A.K. also claimed that when Olga asked her father when she could see her maternal grandparents, he told her "that would get sorted out very soon and I'll call your grandmother to discuss all of that."

Plaintiffs allege that the first time Olga called them after the funeral was on May 6, 2011. The child spoke with plaintiffs for approximately twenty minutes while defendant listened on the extension line. According to plaintiffs, the conversation ended when defendant "promised that he would do

everything to maintain the relationship between [Olga] and plaintiffs."

Plaintiffs spoke on the phone to Olga again on May 12, 2011, but only for a few minutes. The child allegedly told her grandmother that her father "was in the bathroom and she would have to hang up if he comes out." The next call occurred seven days later on May 19, 2011. Defendant again listened on the extension line as Olga asked her grandmother when she was coming to visit her. The child played the flute for her grandparents over the phone, spoke about her cat who then lived with plaintiffs in Florida, and she mentioned making new friends in school.

Defendant permitted Olga to call plaintiffs nine times over the next thirteen months. Plaintiffs alleged they did not speak to their granddaughter in June, August, September, and October 2011. The last call the child made was on January 30, 2012. Plaintiffs attempted to call Olga on a daily basis using defendant's landline to no avail. Plaintiffs also suspect defendant had taken Olga's cell phone. Plaintiffs' attempts to reach the child via email were also fruitless. Their several emails to defendant asking to discuss the situation in an effort to reach a mutually agreeable protocol for contacting Olga were unanswered. Plaintiffs thus claimed they "exhausted all efforts

14

to amicably resolve this matter directly with the defendant without the cost of litigation."

Defendant sees matters completely differently. He views the time plaintiffs spent with Olga before her mother's untimely death as a negative and abusive experience to his daughter's emotional and physical wellbeing. The following paragraphs from defendant's certification to the trial court illustrate the magnitude of the discord:

> 25. The danger and abuse that [Olga] had to endure over the past few years took its toll on every facet of her life, having a negative impact on her health, safety, and well-being. [sic]. She was physically and emotionally suffering on a daily basis. The Plaintiffs knowingly watched [Olga's] home life with her mother drastically deteriorate. The Plaintiffs were the only ones who knew the true condition of [Olga's] mother's home and A.K. later admitted to me on the telephone that she feared for [Olga's] safety but she still did nothing to protect [Olga]. As I continued to fight for [Olga's] safety through the Courts, through her school, and DYFS,[5] the Plaintiffs

---

[5] "DYFS" stands for Division of Youth and Family Services, now known as the Division of Child Protection and Permanency. Plaintiffs strongly dispute any implication that DYFS ever investigated their late daughter based on any allegations or suspicions of abuse or neglect of her children. As previously noted, plaintiffs averred law enforcement authorities investigated the cause of Charles' death and found no evidence to conclude it was nothing more than a tragic accident. Evidence relating to plaintiffs' activities during the time Olga resided with them needs to be gathered through the process of discovery. We anticipate that this discovery will also include evidence showing what concrete action, if any, defendant took to
(continued)

continue to watch [Olga's] life deteriorate to the point where she was wearing dirty clothes, at times had no food, barely slept, and had fallen so far behind in school that her promotion from the fourth grade was questionable.

. . . .

27. Ultimately, after years of fighting for [Olga's] safety, it took her mom's death to bring to light all of the horrors in [Olga's] life that the Plaintiffs were knowingly covering up while they continued to enable their daughter's drug addiction.

28. The time [Olga] has spent with the Plaintiffs was clearly not the sunshine and roses they describe in their Complaint. Their relationship with [Olga] following the death of her mother has continued to be detrimental to her. Plaintiffs have constantly placed a great amount of pressure on [Olga] to do things. She is told words like "you must call me or I'll get upset" and until the last 18 months she had felt the unnecessary pressure to the point she would break down in tears. During one conversation with [A.K.], [Olga] was even told that she should have called her mom in the hospital. That caused [Olga's] grieving process to backslide and caused several sleepless nights and an extra trip to the grief counselors.[6]

---

(continued)
rescue his children from the deplorable and abusive conditions he described in his certification.

[6] In lieu of subjecting the child to additional and possibly even unnecessary psychological scrutiny, plaintiffs suggested the trial court order defendant to permit Olga's grief counselor to opine if preventing her from having any contact with her maternal grandparents was harmful to her psychological and emotional wellbeing. Defendant objected to this approach and

(continued)

16          A-2338-12T1

PROCEDURAL ANOMALIES

Before we address the substantive basis of the trial court's ruling, we will review in some detail the procedural journey plaintiffs' complaint traveled before it was dismissed on defendant's <u>Rule</u> 4:6-2 motion. Through this review, we have identified a number of systemic anomalies that inadvertently inhibited plaintiffs' ability to present their case in a manner likely to produce a sustainable adjudicative outcome.

As required by <u>Rule</u> 2:6-2(a)(3), plaintiffs' appellate brief contained a section describing the case's procedural history. As part of this history, plaintiffs noted that

> [o]n or about July 13, 2012, [they] attempted to file a Complaint for Grandparent Visitation with the Superior Court of New Jersey, Chancery Division,, Family Part . . . [which] was rejected by the Court because a form complaint was required. Thereafter, Plaintiffs resubmitted the required Verified Complaint form, however, Plaintiffs also attached the more detailed Complaint setting forth the factual allegations. The Complaint was filed on August 7, 2012.

---

(continued)
refused to release any information or records from her therapist. The trial judge ultimately denied plaintiffs' application despite making the lack of expert testimony a critical part of his decision to dismiss plaintiffs' complaint without the benefit of an evidentiary hearing.

A-2338-12T1

The Family Part's decision to return plaintiffs' attorney-drafted complaint, and demand that their counsel submit instead a "check the box" form pleading, was precipitated by systemic changes in the way cases that fall under the umbrella category of "non-dissolution" are processed by the Family Part. This sea change in the processing of non-dissolution cases at the trial level came about as the organic byproduct of Supreme Court committees comprised of family law attorneys, Family Part judges, and dedicated and concerned members of the general public. Despite their best efforts and inclusive approach, it appears grandparent visitation cases do not fit squarely into the revisions that were ultimately adopted to better service the large majority of cases denoted as "non-dissolution" or "FD Docket" cases.

On September 2, 2011, Judge Glenn A. Grant, Acting Administrative Director of the Courts, issued Directive 08-11 to supplement and revise the procedures for processing non-dissolution matters in the Family Part.[7] The revisions implemented by Directive 08-11 were approved by the Judicial

_____

[7] Directive 08-11 is available to the public on the judiciary's website. www.judiciary.state.nj.us/directive/2011/dir_08_11.pdf. (last visited December 17, 2013). Furthermore, administrative directives have the force of law. S.M. v. K.M, ____ N.J. Super. _____, _____ (App. Div. 2013) (slip op at n. 2) (citing State v. Morales, 390 N.J. Super. 470, 472 (App. Div. 2007)).

Council[8], as originally recommended by the Conferences of Family Part Presiding Judges and Family Division Managers.

Directive 08-11 provides a state-wide uniform system for processing cases falling under the general purview of the "non-dissolution docket," also known as the "FD Docket."  As Judge Grant explained in his memorandum to Assignment Judges, Family Part Presiding Judges, Trial Court Administrators, and Family Division Managers:

> The Non-Dissolution docket provides relief to never married parents seeking custody, parenting time, paternity, child support and medical support. It also serves couples seeking certain reliefs, such as financial support without dissolution of their union. Additionally, the Non-Dissolution docket includes non-parent relatives seeking custody, child support and/or visitation regarding minor children. Self-represented litigants comprise the majority of those filing in the Non-Dissolution docket. (Emphasis added).

Of particular importance here, Directive 08-11 requires Family Division intake staff to process all non-dissolution cases "as summary actions, with additional discovery at the discretion of the judge."  It also requires litigants in non-

___

[8] The Judicial Council is the governing body of the judiciary. Chaired by and ultimately answerable to the Chief Justice, the Council consists of the Assignment Judges from all of the vicinages, the Presiding Judge for Administration of the Appellate Division, the Administrative Director of the Courts, and the Chairs of the Conferences of Presiding Judges for the Civil, Criminal, Family, and General Equity Divisions.

dissolution matters to file their initial complaint using standardized complaint forms approved by the Administrative Office of the Courts, and incorporated as an appendix item to Directive 08-11. The directive did not expressly distinguish between the litigant who files pro se and one who is represented by counsel, nor did it provide any dispensation or exemption to cases such as this one, where the pleading was prepared and filed by an attorney. As Judge Grant noted in his memorandum to the vicinages, the revisions were predicated on the reality that "[s]elf-represented litigants comprise the majority of those filing in the Non-Dissolution docket."

Even a cursory review of the standardized Verified Complaint form required by Directive 08-11 reveals it is intended to apply primarily to cases involving disputes between unmarried individuals seeking child support, court-ordered custody, and/or parenting time.[9] The revisions are intended to provide these self-represented litigants with a consistent,

_____

[9] Although less likely, married individuals may also use the standardized Verified Complaint form to file an FD docket action to obtain spousal and child support, and even court-ordered parenting time. The traditional FM matrimonial action is only required when the parties seek dissolution of the marriage as the principal form of relief. In the FM docketed case, equitable distribution, spousal and child support, custody, and parenting time are collateral issues arising from the dissolution of the marriage.

statewide means of accessing the Family Part.  As better stated by Judge Grant:

> Efficient methods for processing Non-Dissolution cases are crucial to the operation of the court and to court customers seeking relief under this docket type.  Having standardized statewide practices enables all court customers to have a clear and consistent understanding and a defined process for the resolution of disputes that fall under this docket type.

The only reference to grandparent visitation actions in the model Verified Complaint is found on page two, under a checkbox with the subheading: "Establish or Modify Visitation Rights." This subheading is further divided into three subcategories described as "Parenting time; Grandparent Time; and Sibling Time."  Each of these subcategories is accompanied by its own checkbox.  After the litigant checks the appropriate box, the form provides three lines for the presumably pro se litigant to elaborate on the reasons for the relief requested.  The last page of the model complaint is left blank for the putative plaintiff to provide any "additional information."  Here, plaintiffs' counsel attached a copy of his initially rejected complaint, which consisted of fifty individually numbered paragraphs describing in great detail the factual basis for the relief requested.

The next critical part of the revisions reflected in Directive 08-11 concerns how the Family Part should process or manage non-dissolution cases once the complaint has been accepted for filing. As a general proposition, the directive reaffirms that all non-dissolution cases should be processed as summary actions. Although this classification is arguably mandated by Rule 5:4-4, the directive reemphasizes this aspect of how this case-type should be managed by Family Part judges.

Rule 5:4-4(a) provides, in relevant part, as follows:

> Family Part summary actions <u>shall include all non-dissolution initial complaints</u> as well as applications for post-dispositional relief, applications for post-dispositional relief under the Prevention of Domestic Violence Act, and all kinship legal guardianship actions. Applications for post-dispositional relief shall replace motion practice in Family Part summary actions. <u>The court in its discretion, or upon application of either party, may expand discovery, enter an appropriate case management order, or conduct a plenary hearing on any matter</u>. (Emphasis added.)

Syllogistically, since grandparent visitation complaints under <u>N.J.S.A.</u> 9:2-7 are docketed as FD non-dissolution actions, and since under the expansive language of <u>Rule</u> 5:4-4 "summary actions shall include <u>all</u> non-dissolution initial complaints," by force of logic grandparent visitation suits must be treated as summary actions. (Emphasis added). Traditionally, summary

actions are expedited proceedings governed by <u>Rule</u> 4:67-1. The summary nature of the action is intended

> to accomplish the salutary purpose of swiftly and effectively disposing of matters which lend themselves to summary treatment while at the same time giving the defendant an opportunity to be heard at the time plaintiff makes his application on the question of whether or not summary disposition is appropriate.
>
> [<u>Washington Commons, LLC v. City of Jersey City</u>, 416 <u>N.J. Super.</u> 555, 564 (App. Div. 2010), <u>certif. denied</u>, 205 <u>N.J.</u> 318 (2011), (quoting Pressler & Verniero, <u>Current N.J. Court Rules</u>, comment 1 on <u>R.</u> 4:67-1 (2014)).]

Summary actions in the Family Part are ordinarily tried without the benefits of discovery. <u>R.</u> 5:5-1. However, even in summary actions, the trial court has the discretion to authorize discovery for good cause shown, <u>Depos v. Depos</u>, 307 <u>N.J. Super.</u> 396, 400 (Ch. Div. 1997); <u>see also</u> <u>R.</u> 5:5-1(d), or to protect a party's due process rights, <u>H.E.S. v. J.C.S.</u>, 175 <u>N.J.</u> 309, 324 (2003). Finally, and particularly relevant here, <u>Rule</u> 5:4-4(a) expressly empowers the trial court with the discretion to order discovery on the court's motion, or "upon application of either party, . . . expand discovery, [or] enter an appropriate case management order, or conduct a plenary hearing on any matter."

Against this regulatory backdrop, we now hold that a complaint seeking grandparent visitation as the principal form

of relief should not be automatically treated by the Family Part as a summary action requiring expedited resolution, merely because it bears an FD docket number. As this case illustrates, such a default approach can be inconsistent with sound principles of judicial case management, and potentially inhibit the grandparents' due process rights to prosecute their case in a manner likely to produce a sustainable adjudicative outcome.

As a matter of sound principles of judicial case management and consistent with rudimentary notions of due process, a verified complaint prepared by an attorney, seeking grandparent visitation as the only form of relief, should not be rejected by the Family Part as facially deficient for filing, merely because it was not presented using a standardized form complaint intended to be used primarily by pro se litigants as a means of facilitating their access to the court. Stated differently, a litigant should not be penalized for retaining an experienced family law attorney to present their case to the court in the form of a professionally drafted pleading.

As a matter of basic respect to the legal profession, we must operate under the presumption that a complaint prepared by an attorney contains a far more comprehensive presentation of the facts and legal principles involved in a case than a standardized form document crafted to identify, in a generic

fashion, the nature of the family action at issue by having a pro se litigant put a checkmark in or write a line across the box next to the subcategory "grandparent visitation." At the very least, an attorney-drafted pleading should be treated no differently than one prepared by a pro se litigant.

Unfortunately, what occurred here demonstrates that, at least at the time and in the vicinage this case was filed, attorney-prepared complaints were routinely rejected as a matter of policy. Compounding this problem, a complaint prepared, filed, and signed by an attorney, who listed the address of his law office as the place where all communications from the court should be sent, was rejected by the Family Part through an automated form-letter sent directly to plaintiffs' home in Florida.

The form-letter informed plaintiffs that "[e]ffective September 1, 2011 the Administrative Office of the Courts issued a Directive <u>which promulgates the revised filing and post-dispositional procedures for the Non-Dissolution (FD) Docket type.</u>" (Emphasis added). The letter continued by apprising plaintiffs that their "Non-Dissolution Complaint/Application (FD) and/or Non-Dissolution Motion/Modification (FD) with supporting papers have been received but have not been filed with the Family Division for the reasons(s) identified below."

The form-letter then lists six unnumbered checkboxes identifying categories or grounds for rejection of plaintiffs' attorney-drafted pleading. Here, three boxes were checked with an "X." The first directed plaintiffs (not their attorney) to "resubmit your Application and/or Modification on the revised forms." It directed plaintiffs to "retrieve" the forms from the New Jersey Judiciary website; the second checked box informed plaintiffs that they "had not included the completed Confidential Litigant Information Sheet," which apparently was attached to the letter; and the third box apprised plaintiffs that "Effective September 1, 2011," the vicinage Family Court would no longer accept motions in FD actions.

The form-letter concluded by notifying plaintiffs that "[i]n accordance with R. 1:5-6(c) if the corrected paperwork and/or documents are submitted to the court within ten 10 days after the date of this notice, original filing date will be preserved." In this case, the filing date was July 17, 2012.

This approach is inappropriate on several levels. First, a default robotic rejection of complaints filed in the Family Part carries an unacceptably high risk of producing the type of insensitive, arbitrary outcome that occurred in this case. Second, the document used convoluted, needlessly bureaucratic language that served only to undermine the "customer

friendly/greater access to the court" policy that was the foundation for the revisions to Directive 08-11. This can only frustrate the litigant who receives this letter and increase the level of alienation and distrust litigants feel about our court system. This "tail wagging the dog" outcome cannot stand.

From the perspective of the bar, this approach displays a disrespect for the work-product of professionally trained and highly experienced family law attorneys. A professionally prepared complaint is likely to identify with particularity the salient factual and legal issues of the case, enabling the judge to triage each case based on their level of complexity, and distinguish those cases that need active case management from those who may benefit from early judicial intervention. This process is also far more likely to lead to possible amicable settlements. A policy that automatically rejects attorney-drafted pleadings ironically makes sound judicial management of these kinds of cases harder.

In Moriarty, the Court upheld the constitutionality of our State's grandparent visitation law based on the principle that "interference with parental autonomy will be tolerated only to avoid harm to the health or welfare of a child." Moriarty, supra, 177 N.J. at 115. In reaching this conclusion, the Court specifically rejected the best interest of the child standard as

a basis to overcome the objections to grandparent visitation by a fit custodial parent.  Id. at 116.

Writing for the Court in Moriarty, Justice Long emphasized

> that a dispute between a fit custodial parent and the child's grandparent is not a contest between equals.
>
> . . . .
>
> Thus, in every case in which visitation is denied, the grandparents bear the burden of establishing by a preponderance of the evidence that visitation is necessary to avoid harm to the child. The grandparents' evidence can be expert or factual. For example, they may rely on the death of a parent or the breakup of the child's home through divorce or separation.  In fact, many of the fifty grandparent visitation statutes specifically recognize the potential for harm when a parent has died or a family breakup has occurred and visitation is denied.  In addition, the termination of a long-standing relationship between the grandparents and the child, with expert testimony assessing the effect of those circumstances, could form the basis for a finding of harm. . . . The possibilities are as varied as the factual scenarios presented.
>
> [Id. at 116-117.  (Emphasis added).]

Plaintiffs' cause of action is predicated on tracking the Court's analysis in Moriarty and thereafter establishing: (1) the existence of a close and prolonged relationship between Olga and plaintiffs during the child's formative years; (2) the animosity and hostility harbored by defendant against plaintiffs

in connection with Charles' death; (3) the death of Olga's mother quickly followed by the restriction and ultimate termination by defendant of all contact between Olga and plaintiffs; and (4) the emotional and psychological harm to Olga if defendant is permitted to deny the child all contact from her mother's side of the family, especially plaintiffs.

Defendant stated in his certification to the trial court that he considers the prospect of plaintiffs remaining in contact with Olga to be not only against his daughter's best interest, but highly dangerous to her psychological wellbeing. The only way for plaintiffs to rebut defendant's presumptively valid objections, is to provide factual testimonial evidence describing their past interactions with the child. Plaintiffs may also decide to present expert testimony as well, especially as it relates to how the child's ability to cope with the death of her mother may be undermined by defendant's decision to exclude plaintiffs from her life.

Although Justice Long in <u>Moriarty</u> referred to "the death of a parent or the breakup of the child's home through divorce or separation" as scenarios in which prohibiting grandparent visitation may be harmful to a child, we reject the notion that these abstract references can be reduced to self-contained, watertight categories of harm, made available to a would be

plaintiff merely by placing a checkmark in a standardized Verified Complaint form. The dynamics of human interactions are too complex, the court's parens patriae responsibilities too great, plaintiffs' statutory rights too precious, and defendant's constitutional rights as a parent too important, to reduce the trial judge's function to performing a prosaic, perfunctory exercise.

Thus, as previously noted, notwithstanding its FD docket designation as a non-dissolution case, when a litigant brings an action seeking grandparent visitation under N.J.S.A. 9:2-7.1, either using the standardized complaint form approved under Directive 08-11 or through an attorney-prepared pleading, the vicinage Family Part Division Manager shall designate the matter as a contested case after joinder of issue and refer the case for individualized case management by a Family Part judge selected by the vicinage Presiding Judge of Family. The judge shall review the pleadings and determine whether active case management is needed.

In furtherance of this case-sensitive approach, we suggest the judge meet with the parties and counsel, if available, as soon as practical after joinder of issue, to determine, on the record: (1) the nature of the harm to the child alleged by plaintiff; (2) the possibility of settlement through mediation

or as otherwise provided in Rule 5:5-5; (3) whether pendente lite relief is warranted; (4) the extent to which any of the facts related to the statutory factors identified in N.J.S.A. 9:2-7.1(b)(1) through (8) can be stipulated by the parties; (5) whether discovery is necessary, and if so, the extent and scope of the discovery, as permitted by Rule 5:5-1(a), written interrogatories, production of documents, Rule 4:18-1, request for admissions, and consent to release documents not within the possession of the party -- discovery may be completed within the time allotted in Rule 5:5-1(e), or as otherwise ordered by the court; (6) whether expert testimony will be required, and if so, the time for submission of the expert's report and curriculum vitae, the time for submission of defendant's rebuttal report if any, and whether deposition of the expert(s) will be required or permitted; (7) a protocol for the filing of motions, including motions to compel discovery, motions seeking protective orders to exclude or limit evidence based on an assertion of privilege, or because the release of the information would adversely affect the child's best interest, or unduly infringe upon the privacy rights of the custodial parent; and (8) a tentative date for the filing of dispositive motions and/or a plenary hearing if necessary to adjudicate plaintiff's complaint and resolve any material facts in dispute.

This list is by no means exhaustive of the myriad of potential case management issues that may arise in any given case. The need and degree of judicial supervision is left entirely to the discretion of the trial judge. As a practical matter, the court may direct plaintiff's counsel to prepare a draft case management order for the court's review. If plaintiff is appearing pro se, the court, or in the court's discretion, defense counsel, if available, shall prepare a case management order that reflects the outcome of the matters, issues, and decisions discussed and decided at the case management conference.

Although we are satisfied that the burden of proof imposed on plaintiffs in grandparent visitation cases makes these matters ill-suited for traditional summary action designation, the trial court should nevertheless manage these cases with a sense of urgency and be especially mindful that the nature of litigation is per se extremely stressful as well as economically disruptive. Family-related disputes are even more stressful and emotionally debilitating than other types of civil disputes because they often touch the very core of our most intimate experiences, force us to confront our most difficult moments, and require us to reveal the most private details of our lives. As this case shows, grandparent visitation disputes also compel

those involved to relive painful memories, with the hope that those of us entrusted with the awesome power to decide their fate and the fate of their beloved and vulnerable children will do so fairly, expeditiously, compassionately, and most importantly, according to law.

## III

### TRIAL COURT'S RULING

The first communication plaintiffs received from the court after joinder of issue was a notice, again sent directly to plaintiffs at their residence in Florida, summoning them to a "visitation rights hearing." The generic nature of the notice identified plaintiffs' cause of action as a "Parenting Time/ Visitation Rights Counsel Fees" complaint. The notice directed plaintiffs to appear before the trial judge on September 26, 2012 at 9:30 a.m. and bring "a copy of this notice" with them. Despite their counsel's prior appearance in the case, plaintiffs were also told that they "may bring an attorney with you, although the attorney is not required."

Plaintiffs' counsel wrote a letter to the judge named in the notice requesting an adjournment of the September 26, 2012 hearing because the date conflicted with his religious observance. Counsel also requested that the court make the rescheduled hearing date "firm," because plaintiffs resided in

Florida and it would be a hardship for them to travel to New Jersey only to discover that the hearing had been adjourned at the last minute.

By letter dated September 13, 2012, the trial judge granted plaintiffs' counsel adjournment request, rescheduling the hearing to October 10, 2012, at 1:30 p.m.[10] The court also directed that defendant file "an Answer or any other form of responsive pleading by September 24, 2012. All parties should submit a pretrial memorandum to the court by October 1, 2012. A copy of the pretrial memorandum is to be served on all other parties in the case."

As documented in a certification plaintiffs' counsel submitted to the trial court in support of plaintiffs' motion for reconsideration, and as counsel emphasized to us at oral argument in this appeal, upon receipt of the trial court's letter, he called the judge directly

> asking what the purpose of the pre-trial memorandum was and what type of hearing was going to be conducted on October 10, 2012. Counsel was again advised that the matter would proceed to a hearing on that date and once again advised that Plaintiffs could either appear in person or their testimony would be taken over the phone. At no time was it indicated, by anyone from the court, that this initial scheduled matter was a

---

[10] In a notice dated September 14, 2012, the Family Division Manager confirmed that the hearing had been rescheduled.

pre-trial conference or a case management conference.[11]

As directed by the trial court, defendant filed his answer to plaintiffs' complaint through counsel on September 24, 2012. On that same day defendant also filed a motion to dismiss under Rule 4:6-2, sought an award of counsel fees, and despite the fact that this was not a probate matter, requested an accounting of the Estate of K.K. Plaintiffs' counsel filed responding certifications and a legal memorandum.

The parties and their respective attorneys appeared before the court on October 10, 2012. According to plaintiffs' counsel, this was the first time the trial judge advised the parties that the matter was scheduled as "a Case Management Conference." Neither party filed the pretrial memoranda required under Rule 4:25-1. According to the certification submitted by plaintiffs' counsel as part of the appellate record,

> the parties discussed resolution of the matter which did not appear possible. I also asked that the court order that the granddaughter be examined by a court appointed psychologist so that a determination could be made as to the impact

---

[11] In his certification to the trial court, plaintiffs' counsel acknowledged that the trial judge's clerk told him when he telephoned the court that he should file "a pre-trial memo pursuant to R. 4:25." Rule 4:25-1 sets out the procedures governing pretrial conferences in the Civil Division.

of terminating all visitation and contact with the grandparents who helped raise her. Defendant objected and the court indicated it would not order that, at this time.

Because the court did not have the papers to rule on the Motion [to dismiss filed by defendant] it was suggested that we schedule the matter for a hearing date and the parties agreed on the date of November 14, 2012. The court further indicated it would rule on the papers on the Motion and than [sic] we would have a hearing. In that conversation I asked the court if an expert was needed, since the expert would not have met or spoken to [Olga.] Also, the expert would not have any records to review. The response was that if was a decision I would have to make prior to the hearing.

When we left that conference it was rather clear to me that the court was simply going to review and deny the Motion and that the parties would appear in court on November 14, 2012. Instead, the court entered its Order dated October 17, 2012 granting the Motion to Dismiss Plaintiffs' Complaint and supported that decision by a two page Opinion that was attached to the Order.

By letter dated October 17, 2012, the trial judge transmitted his order and memorandum of opinion dismissing plaintiffs' complaint based on defendant's Rule 4:6-2 motion. Despite the numerous and extensive material issues of fact in dispute we have described at length here, the trial judge began his analysis by finding that "[t]he facts are not in dispute." The judge appears to have based this conclusion by focusing on three specific events: (1) the death of the child's mother in

April 2011; (2) the lack of personal contact between the child and plaintiffs since the mother's funeral; and (3) defendant's decision to prohibit telephone contacts between the child and plaintiffs commencing in January 2012.

After citing the standard for relief established by our Supreme Court in Moriarty and noting the holdings in three published opinions from this court that have addressed grandparent visitation actions arising from a variety of factual settings, the motion judge found that "plaintiffs' pleadings and proofs establish no more than a general, unsubstantiated allegation of harm." Based on a truncated recitation of the material facts, and noting plaintiffs' failure to produce expert testimony to substantiate or bolster their claims of harm to Olga, the motion judge believed himself "obligated to dismiss the Complaint filed by the plaintiffs." The court also denied plaintiffs' motion for reconsideration.

IV

SUBSTANTIVE ANALYSIS

Because the trial court dismissed plaintiffs' complaint as a matter of law, our review of the court's decision is de novo. Smerling v. Harrah's Entm't Inc., 389 N.J. Super. 181, 186 (App. Div. 2006). Furthermore, "[a] trial court's interpretation of the law and the legal consequences that flow from established

facts are not entitled to any special deference." <u>Manalapan Realty, L.P. v. Tp. Comm. of Manalapan</u>, 140 <u>N.J.</u> 366, 378 (1995).

Since at least 2000, every state in the Union has given grandparents the statutory right to have contact with their grandchildren. <u>Troxel v. Granville</u>, 530 <u>U.S.</u> 57, 73-74 n. 1 120 <u>S. Ct.</u> 2054, 2064 n. 1 147 <u>L. Ed.</u> 2d 49, 61 n. 1 (2000). Our own Supreme Court has acknowledged that the importance of the grandparent-grandchild relationship has been "confirmed" by psychiatrists and social scientists that have studied the field.

> The emotional attachments between grandparents and grandchildren have been described as unique in that the relationship is exempt from the psycho-emotional intensity and responsibility that exists in parent/child relationships. The love, nurturance, and acceptance which grandchildren have found in the grandparent/grandchild relationship confers a natural form of social immunity on children that they cannot get from any other person or institution.
>
> [<u>Moriarty</u>, <u>supra</u>, 177 <u>N.J.</u> at 97 (internal citations and quotation marks omitted).]

The Legislature in our State has codified the rights of grandparents to have contacts with their grandchildren under the following provisions:

a. A grandparent or any sibling of a child residing in this State may make application before the Superior Court, in accordance with the Rules of Court, for an order for visitation. It shall be the burden of the applicant to prove by a preponderance of the evidence that the granting of visitation is in the best interests of the child.

b. In making a determination on an application filed pursuant to this section, the court shall consider the following factors:

(1) The relationship between the child and the applicant;

(2) The relationship between each of the child's parents or the person with whom the child is residing and the applicant;

(3) The time which has elapsed since the child last had contact with the applicant;

(4) The effect that such visitation will have on the relationship between the child and the child's parents or the person with whom the child is residing;

(5) If the parents are divorced or separated, the time sharing arrangement which exists between the parents with regard to the child;

(6) The good faith of the applicant in filing the application;

(7) Any history of physical, emotional or sexual abuse or neglect by the applicant; and

(8) Any other factor relevant to the best interests of the child.

c. With regard to any application made pursuant to this section, it shall be prima

facie evidence that visitation is in the child's best interest if the applicant had, in the past, been a full-time caretaker for the child.

[N.J.S.A. 9:2-7.1.[12]]

Last amended in 1993, the factors outlined in N.J.S.A. 9:2-7.1(b) were intended to provide a mechanism for resolving the tension between a parent's constitutional right to autonomy over his or her child and the State's implicit public policy of fostering and encouraging contacts between grandparents and their grandchildren. In re Adoption of a Child by W.P. & M.P., 163 N.J. 158, 165-66 (2000). To accomplish this Legislative goal, when grandparents file a complaint seeking contacts with their grandchildren under the statute, the trial court must conduct a fact-sensitive inquiry addressing the seven particularized factors in N.J.S.A. 9:2-7.1(b)(1) to -(7), as

---

[12] On September 27, 2012, General Assembly Bill A3297 was introduced to repeal N.J.S.A. 9:2-7.1. A3297 was referred to the General Assembly Judiciary Committee, which did not take any action on this Bill before the end of the legislative session. On June 20, 2013, the State Senate passed S2975, a Bill to codify the Supreme Court's holding in Moriarty, supra, 177 N.J. at 117, and establish a series of statutory factors for the trial court to consider in determining whether grandparent visitation is in the best interest of the child. S2975 was formally received by the General Assembly on June 20, 2013, and referred to the General Assembly Judiciary Committee for consideration as General Assembly Bill A2945. On November 25, 2013, the General Assembly Judiciary Committee reported out A2945 as amended and recommended its passage. The General Assembly did not vote on A2945 before the end of this legislative session.

well as the "any other factor" failsafe category in N.J.S.A. 9:2-7.1(b)(8).  Moriarty, supra, 177 N.J. at 100.

In going about this analysis, the trial judge must keep in mind Justice Long's admonition in Moriarty:

> Because the Grandparent Visitation Statute is an incursion on a fundamental right (the right to parental autonomy), under [Watkins v. Nelson, 163 N.J. 235 (2000)], it is subject to strict scrutiny and must be narrowly tailored to advance a compelling state interest. Our prior jurisprudence establishes clearly that the only state interest warranting the invocation of the State's parens patriae jurisdiction to overcome the presumption in favor of a parent's decision and to force grandparent visitation over the wishes of a fit parent is the avoidance of harm to the child.  When no harm threatens a child's welfare, the State lacks a sufficiently compelling justification for the infringement on the fundamental right of parents to raise their children as they see fit.  However, when harm is proved and the presumption in favor of a fit parent's decision making is overcome, the court must decide the issue of an appropriate visitation schedule based on the child's best interests.
>
> [Id. at 114-115.  (Emphasis added).]

Thus, the trial judge must first conduct a fact-sensitive analysis applying the statutory factors in N.J.S.A. 9:2-7.1, to determine whether the grandparents have presented a prima facie case warranting the relief requested.  Once a prima facie case has been established, the court must then determine whether the grandparents have proven, by a preponderance of the evidence,

that visitation is necessary to avoid harm to the child. <u>Id.</u> at 117. Although noted earlier, it is worth emphasizing that the grandparents can meet this burden by presenting either factual or expert testimony. <u>Ibid.</u> In determining the question of harm, the court "may rely on the death of a parent or the breakup of the child's home through divorce or separation." <u>Ibid.</u>

With this analytical paradigm in mind, we turn to the trial court's decision in this case. We are compelled to reverse the trial court's decision because it did not apply the statutory factors in <u>N.J.S.A.</u> 9:2-7.1, nor conduct the fact-sensitive analysis mandated by the Court in <u>Moriarty</u>. As the procedural history shows, plaintiffs' cause of action fell prey from its inception to a systemic approach that placed the case on the conveyor-belt of "pro se non-dissolution summary actions." Once so designated, the system inexorably channeled the case to the designated judge, who likewise summarily disposed of the case despite plaintiffs' counsel's best efforts to convince the court of the need to conduct the kind of fact-sensitive analysis the Supreme Court mandated in <u>Moriarty</u>.

In the interest of clarity, we will briefly discuss and distinguish the cases relied on by the trial court. In <u>Daniels v. Daniels</u>, 381 <u>N.J. Super.</u> 286, 288 (App. Div. 2005), the

grandmother sought visitation under N.J.S.A. 9:2-7.1, alleging she had a strong and loving relationship with her minor grandchildren. In sharp contrast to the key facts confronted by the trial court here, the trial court in Daniels granted the defendants' motion to dismiss because the parents of the children "were an 'intact family' and were united in their opposition to letting the grandmother have visitation with their children." Ibid.

In affirming the trial court, we rejected the plaintiff's attack on the trial court's holding as constituting a per se bar of all grandparent visitation actions involving an intact family. We upheld the trial court's decision because the plaintiff did not allege facts showing that denial of grandparent visitation would harm the children. Id. at 292-293. With respect to the need for discovery, we emphasized that in both the trial court and at the appellate level the plaintiff failed "to specify any concrete harm the children are suffering, or will suffer, by virtue of the lack of visitation." Id. at 293.

Here again the salient facts are far different. Olga not only had a long and close relationship with her grandparents during her formative years, but she actually resided with her grandparents for an extensive period of time after her parents

divorced and after the tragic death of her younger sibling. Olga's association with her grandparents came to an abrupt end as a result of her mother's death, a traumatic event specifically used by the Court in <u>Moriarty</u> as an example to illustrate where the relief requested by plaintiffs may be warranted.

<u>Rente v. Rente</u>, 390 <u>N.J. Super.</u> 487 (App. Div. 2007), was another case cited by the trial court here in support of its decision to dismiss plaintiffs' complaint without a hearing or discovery. Once again, the facts are inapposite to the ruling made by the court. The defendant in <u>Rente</u> was the mother of a four-year-old boy who had obtained a final restraining order (FRO) against her husband, the boy's father, under the Prevention of Domestic Violence Act. <u>Id.</u> at 490. Under the terms of the FRO, the defendant/mother had sole physical custody of the child and the father was granted supervised parenting time "on alternative weekends, monitored by plaintiffs [/paternal grandparents.]" <u>Ibid.</u>

The plaintiff brought an action seeking grandparent visitation with the boy. Her only claim for such relief was based on the paternal grandmother's claim that she had babysat her two-year-old grandson "on occasions" when the defendant/mother was unable to care for him due to work schedule

or illness. The paternal grandmother estimated this occurred approximately twenty-five times the previous year, and about four times in the year she filed the complaint for visitation. Id. at 491.

On these facts, the Family Part conducted a trial in which the grandmother testified describing the activities she engaged in with the boy during the times she was babysitting him. The grandfather's only claim for visitation was the fact that the boy was his grandson. Ibid. The defendant disputed the grandmother's testimony concerning the frequency of the babysitting sessions. It was undisputed that the plaintiffs had not seen their two-year-old grandson since the defendant obtained the FRO against the boy's father. Ibid.

Despite the lack of any evidence showing the child would be harmed if the plaintiffs were precluded from having any contacts with him, the trial court granted the relief requested for a period of one month. The court's decision was based, in large part, on the defendant's decision to consent to the visitation. Id. at 492. We noted, however, that the defendant objected to the scope of the visitation schedule ordered by the trial court. Ibid. During the time this temporary visitation schedule was in place, the court appointed a psychologist to perform a psychological evaluation. Ibid.

At the conclusion of the one-month temporary visitation period, the psychologist recommended that the court continue grandparent visitation. The psychologist found "both natural parents have significant adjustment problems that impair their parenting ability[.]" Ibid. In his opinion, the grandparents represented the only stable influence in the child's life at time. Overruling the defendant's objection, the trial court admitted the psychologist's report into evidence and granted the plaintiffs unsupervised visitation on alternate weekends. Ibid.

After reviewing the relevant legal principles established by the Court in Moriarty, we reversed, holding that "[t]he grandmother's testimony of babysitting for her two-year-old grandson on occasion failed to establish even a prima facie case of the requisite harm under Moriarty to rebut the presumption in favor of parental decision-making that would necessitate a psychological evaluation and hearing." Id. at 494.

We also concluded the trial court committed reversible error by admitting the psychologist's report over the defendant's objection, without offering her an opportunity to obtain her own expert, providing her with a copy of the report to review prior to the hearing, and giving her a reasonable opportunity to depose the psychologist or making him subject to cross-examination, in violation of Rule 5:3-3. Id. at 495. We

also found the information in the expert's report was insufficient to establish a prima facie case of harm to the child under Moriarty. Ibid. The psychologist's analysis was essentially a net opinion not based on any meaningful contacts with the parties, and applied a "best interest of the child" standard instead of the relevant "harm to the child" standard under Moriarty. Ibid.

Thus, Rente reinforces our holding here that, depending on the circumstances of the case, discovery in grandparent visitation cases is not only permissible under Moriarty, but indispensable in reaching a sustainable outcome. Rente is thus not only procedurally distinguishable from this case, it also reinforces the need for discovery given the circumstances of the controversy before the court.

Mizrahi v. Cannon, 375 N.J. Super. 221 (App. Div. 2005), was the last case relied on by the trial court to support its decision to dismiss plaintiffs' complaint without a hearing. As was the case with Daniels and Rente, Mizrahi is both procedurally distinguishable and factually inapplicable to the issues we confront here. The plaintiffs in Mizrahi were the paternal grandparents of a seven-year-old girl who had been residing with her maternal great-aunt after the death of the child's mother. Id. at 223. The child's father was estranged

47

from her based on his serious emotional, psychological, and substance abuse problems. Ibid. In fact, the child was three months old when her father physically assaulted her mother, causing her to obtain a domestic violence restraining order against him. Ibid.

The record showed that despite this abuse, the plaintiffs remained loyal to their son. In addition to the conflict created by this loyalty, there were also tensions about the child's religion because the mother was a devout Catholic and the plaintiffs/paternal grandparents were Jewish. Id. at 224. The child was only two-years-old when her mother was diagnosed with Stage III cervical cancer. Ibid. The defendants were given legal and physical custody of the child when her mother died three years later. Id. at 225.

The plaintiffs testified at trial in support of their complaint seeking visitation. According to the paternal grandmother, she saw the child three times the year before her mother died. There was no testimony that the child showed any reaction to her grandmother's visits. Ibid. The defendants testified that the child was reluctant to see the plaintiffs. Id. at 226. She was fearful and anxious after the visits. Ibid. After the third visit, the defendants decided to terminate the visitations in the child's best interest. Ibid.

The defendants adopted the child three years after her mother's death. The trial court granted the plaintiffs' request for visitation. We reversed, noting that despite acknowledging the standard articulated by the Court in Moriarty, the trial court applied a "best interest of the child" standard in awarding visitation rights to the plaintiffs. Id. at 232. We noted the absence of any

> evidence during the trial that [the child] would experience guilt or inadequacy if visitation did not occur. Nor was there any evidence that she could experience confusion over the fact that she saw her maternal grandmother . . ., but not [the plaintiffs]. There was no evidence that as [the child] grew older, she would not be able to learn about Jewish heritage and tradition. There was no evidence that [the child] will experience a void in her life if she does not visit with [the plaintiffs] or that, as she got older, she would experience feelings of rejection. Nor was there any evidence that [the child] would suffer economically; there was no showing that [the defendants] are unable to meet [the child's] needs.
>
> [Id. at 234.]

Here, the trial court misapplied the central thesis of our holding in Mizrahi by dismissing plaintiffs' complaint at the early stages of the litigation process. Grandparents seeking to overcome a presumptively valid parental objection to visitation must be afforded the opportunity to gather the evidence necessary to meet this burden of proof. The grandparents in

49                                                          A-2338-12T1

<u>Mizrahi</u> were given that opportunity by the trial court. In short, the trial court here failed to appreciate the procedural and factual characteristics of <u>Mizrahi</u>, and as a result incorrectly denied plaintiffs the opportunity to establish a basis for the relief requested.

With this analysis as a backdrop, we return to <u>Moriarty</u> for guidance. Distilled to its essence, the Court in <u>Moriarty</u> held that: (1) in every case in which visitation is denied, the grandparents bear the burden of establishing by a preponderance of the evidence that visitation is necessary to avoid harm to the child; (2) most of the grandparents visitation statutes adopted throughout the country specifically recognize the potential for harm when a parent has died or a family breakup has occurred and visitation is denied; (3) although harm can be established by either factual testimony from a witness or opinion testimony by an expert, the termination of a long-standing relationship between the grandparents and the child, with expert testimony assessing the effect of those circumstances, could form the basis for a finding of harm; and (4) if the trial court finds the grandparents have established the potential for harm by a preponderance of the evidence, the presumption in favor of parental decision making will be deemed overcome. <u>Moriarty</u>, <u>supra</u>, 177 <u>N.J.</u> at 117.

Once the presumption in favor of the parent is overcome, the parent is required to offer the grandparents a reasonable visitation schedule. _Ibid._ If the grandparents accept the visitation schedule offered by the parent, the trial court will enter an order memorializing the agreement, thus reducing it to an enforceable judgment. _Ibid._ If the grandparents are not satisfied with the proposed visitation schedule, the trial court must assess the reasonableness of the proposal and thereafter approve a schedule that it finds is in the child's best interest, based on the application of the statutory factors in _N.J.S.A._ 9:2-7.1. _Id._ at 117-118.

V

## CONCLUSION

We will now apply the legal principles we have discussed to the facts of this case. As a starting point, pursuant to both the court's parens patriae responsibility and the discretionary authority conferred to it in _Rule_ 5:4-4(a), it is clear to us that this case falls within the class of complex litigation that requires the trial court to conduct a case management conference through which counsel can alert the court of the discovery necessary to present the matter for trial. The case management order derived from this conference should therefore describe the nature and scope of discovery the court has authorized and set

reasonably attainable deadlines for responding to interrogatories, producing documents, deposing witnesses, and submitting expert reports, if any. Any discovery must reflect and ensure a proper balance between plaintiffs' right to gather evidence in support of their application, defendant's right to parental autonomy, and the child's welfare, including her right to privacy.

As previously noted, the common law did not recognize the right of grandparents to interact with their grandchildren over the objections of a fit parent. Plaintiffs' cause of action is therefore entirely grounded on the statutory factors adopted by the Legislature in N.J.S.A. 9:2-7.1. We are thus particularly troubled by the trial court's failure to address the factors in N.J.S.A. 9:2-7.1(b)(1) to -(8). On remand, the court's ultimate decision must reflect a fact-sensitive analysis addressing all of the relevant statutory factors in N.J.S.A. 9:2-7.1(b). Moriarty, supra, 177 N.J. at 100.

However, each case brings to the court its own set of unique challenges. Here, how the parties interact with each other and with Olga remains profoundly influenced by events that preceded the death of the child's mother. Specifically, the record shows defendant harbors a great resentment against plaintiffs stemming from the role they played in convincing the

matrimonial judge to award K.K. physical custody of the children. Furthermore, as the wrongful death action he brought against plaintiffs shows, defendant holds plaintiffs responsible for the untimely death of his son Charles. Thus on remand, in deciding whether the denial of grandparent visitation would cause harm to Olga, the trial court must determine to what extent defendant's resentment against plaintiffs prejudices his parental judgment in this case, and how such an emotionally driven bias may negatively affect Olga's psychological and emotional wellbeing.

Given Olga's age, the court should also consider whether to conduct an in camera interview as a means of ascertaining how this turmoil has affected her thus far, and how the continued enforcement of this father-driven estrangement from her grandparents may affect her in the future. Either as an alternative to a direct interview by the judge, or as an additional means of protecting the child's best interest, the court should also consider appointing a guardian ad litem (GAL) pursuant to Rule 5:8B. Because plaintiffs bear the burden of rebutting defendant's presumptively valid objections as the father of this child, it is entirely appropriate that they should be held responsible to pay the GAL's fees under Rule 5:8B(d) as part of the cost of the proceedings. See In re

A-2338-12T1

Adoption of a Child by J.D.S. II, 353 N.J. Super. 378, 403-04, (App. Div. 2002), certif. denied, 175 N.J. 432 (2003).

We conclude our analysis by noting the remarkable similarities between the allegations raised by plaintiffs in this case and the prevailing factual account in Moriarty. As the Supreme Court's recitation of the Family Part's findings indicates, the children in Moriarty had a "very extensive relationship with their grandparents," spending "years where they were seeing the grandparents every other weekend." Id. at 118. The Court in Moriarty also emphasized that the relationship between the children and the mother "was significant in a different way because their mother had recently died." Id. at 119.

It is undisputed that Olga shared a household with plaintiffs for a number of years. According to plaintiffs, their relationship with Olga continued to be a close one even after they relocated to Florida. Olga's relationship with her maternal grandparents was also significantly affected by her mother's untimely death. The Court in Moriarty approvingly quoted and adopted the trial court's "most critical findings," that because of the mother's death, "it is extremely important that the children continue a bond with their mother's side of the family." Id. at 121.

Although the trial court in Moriarty had the benefit of expert testimony to support this finding, it was error for the trial court here to use plaintiffs' failure to present expert opinion in this regard as a basis to dismiss their complaint. First, the trial court made its decision here based on defendant's Rule 4:6-2 motion, as supplemented by conflicting certifications submitted by both sides of this dispute. The court was therefore obligated to apply the standards for deciding a motion for summary judgment under Rule 4:46-2(c). Under this standard of review, the court was obligated to draw reasonable inferences from the evidence viewed in the light most favorable to plaintiffs. Brill, supra, 142 N.J. at 540.

As expressly authorized by the Court in Moriarty, plaintiffs were entitled to present their case without expert testimony. Id. at 117. Even if the trial court concluded that expert testimony was required here, given the procedural infancy of the case, basic fairness demands that plaintiffs be given the opportunity to retain such an expert. In short, the dismissal of plaintiffs' cause of action under these circumstances was factually unwarranted and legally untenable.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2338-12T1