867 A.2d 490 (2005)
375 N.J. Super. 221
Renee MIZRAHI and Jack Mizrahi, Plaintiffs-Respondents,
v.
James CANNON and Roseann Cannon, Defendants-Appellants.
Superior Court of New Jersey, Appellate Division.
Argued January 12, 2005.
Decided February 22, 2005.
*491 William T. Smith, Newark, argued the cause for appellants (Hook, Smith & Meyer, attorneys; Mr. Smith, on the brief).
Richard C. McDonnell, Ramsey, argued the cause for respondents (McDonnell & Whitaker, attorneys; Mr. McDonnell, on the brief).
Before Judges WEFING, FALL and PAYNE.
The opinion of the court was delivered by
WEFING, P.J.A.D.
Plaintiffs Renee and Jack Mizrahi filed a complaint seeking to establish their rights under N.J.S.A. 9:2-7.1, which affords visitation rights to grandparents. Following a bench trial, the trial court entered a judgment directing defendants James and Rose Ann[1] Cannon to submit a proposed visitation schedule and engage in reunification therapy. The Cannons appeal from portions of that judgment. We stayed the judgment and accelerated the Cannons' appeal. After reviewing the record in light of the contentions advanced on appeal, we reverse.
The central person to this appeal is Raquel, the seven-year-old granddaughter of the Mizrahis. Raquel's mother was Genevieve Rodriguez, who died from cervical cancer on September 21, 2001, at the age of thirty-seven. Genevieve lived for approximately one year with Maurice Mizrahi, the son of Renee and Jack. Raquel was born of that relationship.
Defendant Rose Ann Cannon is the sister of Genevieve's mother and is thus Genevieve's maternal aunt and Raquel's great-aunt; defendant James Cannon is married to Rose Ann. The record is clear that Genevieve had a very close relationship with her aunt and uncle, which was only strengthened by her illness.
Maurice has a variety of serious emotional and psychological problems. He has abused drugs and alcohol for years, and he is a cross-dresser. When Raquel was approximately three months old, Maurice assaulted Genevieve, and Genevieve told him he had to leave. From that point forward, Genevieve was committed to preventing *492 Maurice from having any contact with Raquel. He physically attacked Genevieve more than once; on one of those occasions Genevieve was holding the infant Raquel. Genevieve ultimately found it necessary to obtain restraining orders against Maurice, barring him from any contact with her or with Raquel. One such order was entered in June 1998 in Kings County, another in December 1998 in New York County.
Renee Mizrahi admitted that after Genevieve separated from Maurice, she made many attempts to convince Genevieve to agree to a reconciliation with her son. Genevieve, however, was adamant that neither she nor Raquel would have anything to do with Maurice.
In addition to Maurice, two other issues divided the parties. The Mizrahis are devout Orthodox Jews while Genevieve was a devout Roman Catholic. Genevieve wished Raquel to be raised as a Catholic. The Cannons were Raquel's godparents when she was baptized, and Raquel is enrolled in a Catholic elementary school. The Cannons testified that Genevieve told them that Jack Mizrahi would not enter her apartment because of the religious objects she displayed. Renee denied that but did say that before Genevieve became ill, Genevieve would take down such items in advance of their visiting.
The other divisive item was money. Genevieve did not work after Raquel was born and struggled to make ends meet. Maurice contributed nothing for his daughter's support. Renee Mizrahi testified that she and her husband paid many of Genevieve's expenses, such as rent and utilities, and would contribute money toward necessities, such as diapers for the baby. Although the trial court did not permit a full record to be developed on the issue, it is fairly inferable from what was presented that the Mizrahis were able to make these contributions without suffering any financial discomfort.
In September 1999, when Raquel was only two years old, Genevieve was diagnosed with Stage III cervical cancer. The cancer was deemed inoperable, and Genevieve began a debilitating course of chemotherapy and radiation. Genevieve's mother and the Cannons were actively involved in assisting Genevieve in caring for Raquel. Initially, when Genevieve was hospitalized for these treatments or their aftermath, Raquel would stay with Barbara Panza, Genevieve's mother. When Genevieve would be home from the hospital, her mother would be at her apartment every day to assist her. In October and November 2000 Genevieve and Raquel spent six weeks with the Cannons when Genevieve had reached a point she could not care for Raquel, and Barbara Panza could not care for Genevieve and Raquel by herself. Shortly before Thanksgiving, Genevieve improved somewhat, and she and Raquel returned to Genevieve's apartment. In February 2001, Genevieve again began to deteriorate. Genevieve had already decided that she wanted the Cannons to care for Raquel after her death, and they agreed to do so. In February 2001, when she was hospitalized on an emergency basis, Genevieve decided it would be best for Raquel to move in with the Cannons at that point and not experience further disruption. Raquel has resided with them continuously since then.
Shortly before Genevieve's death, the Cannons filed an application seeking custody of Raquel. An order granting them that custody was entered in January 2002.
According to the testimony of Renee Mizrahi, she saw Raquel three times in 2001. The first was in January. She had no contact with Raquel between January 2001 and September 2001, when she saw Raquel at Genevieve's funeral. There was *493 no testimony that Raquel showed any reaction to seeing her grandmother that day.
Barbara Panzer and Renee Mizrahi did speak that day, but with unfortunate results. As we noted earlier, the Mizrahis had advanced money to help Genevieve and, on occasion, had asked Genevieve about being repaid. Renee Mizrahi testified that Genevieve had told her that she was going to receive an inheritance from a relative and the Mizrahis would be repaid. Renee Mizrahi also testified that Genevieve had told her on one occasion that she had an ancestor who was Jewish. At the conclusion of the funeral service, which had taken place at Genevieve's parish church, Renee Mizrahi approached Barbara Panzer to inquire about this inheritance and being repaid the money she and her husband had contributed to Genevieve's care. She also asked if it were true that one of Genevieve's relatives had been Jewish. Ms. Panzer was upset by these questions.
After that encounter, Renee Mizrahi called the Cannons to inquire about visiting with Raquel. Three such visits occurred, all in New York City. The first, in November 2001, was at the Children's Museum, the second, in January 2002, at the Museum of Natural History, and the third, in the spring or summer of 2002, at the Central Park Zoo.
According to the Cannons, these visits were unsuccessful. They testified that the Mizrahis did not engage Raquel during these visits but remained somewhat aloof from her. They also testified that Raquel did not want to go, and her unwillingness deepened with each occasion. The Cannons said that Raquel is normally an outgoing, friendly child but that she was withdrawn and timid during these visits. The Cannons testified that after the visits, Raquel was fearful and anxious and needed constant reassurances that the Cannons would continue to care for her and that she would not have to leave them. Following these visits, Raquel would wake up with nightmares, which she never did otherwise, even during her mother's illness and after her death.
Renee Mizrahi and Rose Ann Cannon had several telephone conversations in the months after Genevieve died. These conversations did nothing to bridge the gulf that separated these families. During one telephone call, Renee Mizrahi requested Raquel's social security number and asked about the possibility of the Mizrahis claiming Raquel as a dependent on their income taxes in light of the funds they had previously advanced to Genevieve. In another conversation, she again inquired whether Genevieve was the beneficiary of an estate and thus had funds to repay the money the Mizrahis had advanced. Renee Mizrahi also inquired whether Raquel had received a card and check that had been sent in the name of Maurice. Rose Ann remonstrated that, pursuant to the court orders, Maurice was not to have any contact with Raquel.
The Cannons decided in light of Raquel's reactions after her three visits with the Mizrahis that it was not in Raquel's interest to continue these visits. They were also concerned that the Mizrahis would attempt to facilitate contact between Raquel and Maurice and would attempt to turn Raquel to Judaism. The Mizrahis denied any such intent.
In February 2004, the Mizrahis filed their complaint seeking grandparent visitation. On April 3, 2004, the Cannons filed a complaint seeking to adopt Raquel. The Mizrahis did not contest the adoption. Trial on the Mizrahis' complaint commenced on May 17, 2004. The trial court issued its written opinion on June 18, 2004, and entered its judgment on July 6, 2004. On August 6, 2004, the Cannons appealed. On September 30, we granted the Cannons' *494 motion for a stay of the judgment and to accelerate the appeal. On October 1, 2004, a judgment of adoption was entered, which provided:
1. Said child shall be adopted by the plaintiffs, James Cannon and Rose Ann Cannon, husband and wife.
2. The name of the child shall be Raquel Fiona Cannon.
3. From the entry of this Judgment all relationships between this child and biological parents shall be terminated, as well as all rights, duties and obligations of any person founded upon such relationship, including the rights of inheritance under the intestate laws of this State.
4. The entry of this Judgment of Adoption shall establish the same relationship between the child and the adopting parents as if such child was born to such adopting parents in lawful wedlock, including the rights of inheritance.
On appeal, the Cannons make two contentions in terms of the question of visitation. First, they assert that in light of the completed adoption, plaintiffs have no further right to seek visitation. They also contend that plaintiffs failed to meet their burden of proof that Raquel would suffer harm if visitation were not permitted.
The trial of this matter was brief. Apart from the parties, the only other witness who testified was Genevieve's mother. Both sides presented starkly different versions of the relationship that existed between Genevieve and the Mizrahis, and the Mizrahis and Raquel. In its written opinion, the trial court did not resolve all of the factual disputes but did find the existence of "a warm, close, loving relationship between the Mizrahis, Raquel and Genevieve" until January 2001. There is support in the record for that finding and it is binding upon us on appeal. Cesare v. Cesare, 154 N.J. 394, 411-13, 713 A.2d 390 (1998); Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 483-84, 323 A.2d 495 (1974).

I
The Cannons' first argument revolves around the opinion of the Supreme Court in In re Adoption of Child by W.P., 163 N.J. 158, 748 A.2d 515 (2000), in which the Court held that a child's biological grandparents were not entitled to judicially-enforced grandparental visitation under N.J.S.A. 9:2-7.1, over the objections of nonrelative adoptive parents.[2]
The child in W.P., named V, was born on August 11, 1994; her parents, JH and TS, were never married. W.P., supra, 163 N.J. at 160, 748 A.2d 515. By the time V was six months old, her father TS was in prison, and her mother, JH, placed V with WP and MP. Ibid. JH signed a consent to WP and MP adopting V, and her parental rights were terminated. Ibid.
WP and MP filed a complaint to adopt V, and TS objected. In addition, his parents KS and MS were permitted to intervene in the adoption proceeding, seeking visitation. Upon his initial release from prison, TS resided with his parents, but they were eventually compelled to seek a restraining order against him. Id. at 161, 748 A.2d 515. Ultimately, TS's parental rights were terminated, but his parents *495 continued to seek visitation with V, over the objections of WP and MP. Ibid.
The Court noted the "inherent conflict" that existed between the adoption statute and the statute dealing with grandparent visitation but concluded "that the overriding public policy and statutory law regarding adoptions preclude the application of the Grandparent Visitation Statute when the child is adopted by intact, nonrelative adoptive parents." Id. at 163, 748 A.2d 515.
In its opinion, the Court stressed:
the importance of preserving adoptive parents' autonomy in raising their child after the parental rights of biological parents are terminated. This Court has noted that the primary purpose of the termination of rights provision in the adoption statute is to protect adoptive parents from post-adoption disruptions in their relationship with adoptive children, by natural parents who have surrendered children for adoption or where parental rights [have] been severed.... [T]he ... adoption statute maintains the policy that adoption ends the parental role of the biological parents and transfers that role to the adoptive parents.
[Id. at 173, 748 A.2d 515 (citations omitted).]
The Cannons note the similarity that exists between their situation with Raquel and that which confronted the Court in W.P. One of the reasons the adoptive parents in W.P. did not want further contact between V and TS's parents was their fear that TS, whose parental rights had been terminated, represented "a continuing threat to V's safety and well-being." Id. at 174, 748 A.2d 515. The Court recognized in W.P. that "the grandparents' visitation may provide unsupervised opportunity for TS to have association with V, even though his parental rights have been severed based on parental unfitness." Id. at 175, 748 A.2d 515. The Cannons have similar fears here and assert they should not have to rely upon the assurances of the Mizrahis, no matter how well-intentioned, that Raquel will not be exposed to Maurice.
Additionally, the Court in W.P. noted that "[a]n adoptive family must be given the right to grow and develop as an autonomous family, and must not be tied to the very relationship that put the child in the position of being adopted. Any other ruling would relegate the adoptive parents to `second-class' status.'" Ibid. (quoting Mimkon v. Ford, 66 N.J. 426, 441, 332 A.2d 199 (1975)). As the Cannons point out, it was Maurice's inability to function in a parental role that led to the adoption. They argue that they should not be compelled to continue to expose Raquel to a relationship that is connected to circumstances that resulted in her adoption.
The Cannons contend that a similar analysis should control here. According to the Cannons, to order visitation here would denigrate their autonomy in raising Raquel and lessen their parental authority. They stress that they have made a judgment, as Raquel's parents, that the visits with the Mizrahis cause Raquel emotional distress and anxiety and that the best thing for Raquel at this point is to forego any contact. Maurice's parental rights have been terminated, they note, and thus the Mizrahis, whose rights must be deemed derivative through Maurice, have no right to visit with Raquel over their objection.
The Mizrahis, on the other hand, contend that W.P. is not controlling because the Court in W.P. carefully restricted its opinion to the instance of nonrelative adoption; the Cannons, they point out, are related to Raquel. The Mizrahis rely on Mimkon v. Ford, supra. The child in that case, Jill, was born on July 2, 1966, by *496 which time her parents had already separated. 66 N.J. at 429, 332 A.2d 199. Jill lived with her mother and maternal grandmother, Rose Mimkon, from the time of her birth until her mother's death in November 1970, when Jill was four years old. Ibid. Jill then went to live with her father, who by then had remarried. Ibid. In August 1971, Jill's stepmother adopted her. Ibid. Disputes arose because Jill's maternal grandmother wanted to continue to visit Jill, and her father and stepmother objected. Ibid. The Mimkon Court noted that at common law, a grandparent did not have a right of visitation in the face of parental objection unless the best interest of the child called for such visitation. Id. at 430, 332 A.2d 199. The Court relied on the then-newly enacted grandparent visitation statute, N.J.S.A. 9:2-7.1, to hold that the plaintiff grandmother had independent rights that were not affected by Jill's adoption. Id. at 433, 332 A.2d 199. According to the Court, "[t]he statute create[d] an independent action in the grandparent. In no way does the right asserted by plaintiff depend on continued relations through the deceased daughter." Id. at 431-32, 332 A.2d 199.
Neither Mimkon, involving adoption by a stepmother following the death of the natural mother, nor W.P., involving adoption by non-relatives, is precisely on point. We are cognizant of the fact that a determination by us that W.P. controls could be interpreted as a significant extension of the holding in that case. In our judgment, it is not necessary for us to reach such an expansive determination because a close reading of the record in this case satisfies us that plaintiffs failed to carry their required burden of proof.

II
Three years after W.P., the New Jersey Supreme Court again took up the question of contested grandparent visitation. Moriarty v. Bradt, 177 N.J. 84, 827 A.2d 203 (2003), cert. denied, 540 U.S. 1177, 124 S.Ct. 1408, 158 L. Ed.2d 78 (2004). In the interim, the United States Supreme Court had struck down Washington's grandparent visitation statute as a violation of a parent's fundamental due process rights. Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L. Ed.2d 49 (2000).
The dispute in Moriarty revolved around visitation with two children who were teenagers at the time of the Court's decision. 177 N.J. at 88, 827 A.2d 203. The plaintiff in that case was the children's father, the defendants were the children's grandparents, parents of their deceased mother who had suffered from a significant and long-standing substance abuse problem. Id. at 88-89, 827 A.2d 203. By way of example, at the time the parents separated, their mother was hospitalized for drug abuse. Id. at 88, 827 A.2d 203. When the judgment of divorce was entered in 1993, the plaintiff was given sole custody of the children. Id. at 89, 827 A.2d 203. The defendants were actively involved with their grandchildren, however. Id. at 89-90, 827 A.2d 203. The parties had disputes, but matters came to a head following the 1999 death of the children's mother. Id. at 89, 827 A.2d 203. When the father (who evidently blamed defendants for many of his former wife's problems) sought to severely limit their visitation as not being in his children's best interests, the grandparents sought judicial relief. Ibid. After considering the impact of Troxel, supra, upon N.J.S.A. 9:2-7.1, the Court concluded that for our statute to withstand judicial scrutiny, "grandparents seeking visitation under the statute must prove by a preponderance of the evidence that denial of the visitation they seek would result in harm to the child." Id. at 88, 827 A.2d 203.

*497 [T]he only state interest warranting the invocation of the State's parens patriae jurisdiction to overcome the presumption in favor of a parent's decision and to force grandparent visitation over the wishes of a fit parent is the avoidance of harm to the child. When no harm threatens a child's welfare, the State lacks a sufficiently compelling justification for the infringement on the fundamental right of parents to raise their children as they see fit.... [I]nterference with parental autonomy will be tolerated only to avoid harm to the health or welfare of a child.
[Id. at 115, 827 A.2d 203.]
The Court stressed that "a dispute between a fit custodial parent and the child's grandparent is not a contest between equals.... [T]he best interest standard, which is the tiebreaker between fit parents, is inapplicable when a fit parent is in a struggle ... with a third party." Id. at 116, 827 A.2d 203.
In Moriarty, the children had a "very extensive relationship with the grandparents." Id. at 118, 827 A.2d 203. For years, they saw each other every other weekend. Ibid. The relationship between the children and their grandparents continued through the course of the litigation. Id. at 120, 827 A.2d 203. There was testimony that for the children, their relationship with their grandparents served as a link with their mother, whose death was very upsetting for them. Id. at 119, 827 A.2d 203. In addition, there was testimony that to allow the constricted visitation the father wished would work psychological harm on the children. Id. at 121, 827 A.2d 203. The Court concluded that the record established that "visitation with the grandparents was necessary to avoid harm to the children." Id. at 122, 827 A.2d 203.
We are satisfied that the trial court here, although it recognized the language in Moriarty requiring grandparents to demonstrate by a preponderance of the evidence that visitation with a grandchild was necessary to avoid harm to the child, analyzed the record in terms of its view of Raquel's best interests, rather than whether Raquel would experience harm if she did not visit with the Mizrahis.
Toward the end of its written opinion, the trial court referred to the written summation of the Mizrahis' attorney which listed eighteen "possible harms" to Raquel if the court did not order visitation. These were:
1. Loss of unconditional love, affection and caring;
2. Loss of Jewish heritage and heredity;
3. Probability of guilt and feeling of inadequacy caused by perceived desertion of Father and Father's parents;
4. Loss of contact and relationship with six cousins, the children of the Paternal Grandparents' natural daughter;
5. Confusion over the fact that the Maternal Grandmother is very much in the child's life whereas the Paternal Grandmother and Grandfather are not;
6. Loss of ongoing companionship and the special relationship which often arises between the child and her Paternal Grandparents;
7. Potential loss of economic assistance;
8. Loss of opportunity to learn from loving Paternal Grandparents;
9. Loss of potentially happy memories of good times, which might have been spent with the Paternal Grandparents;
10. Loss of opportunity to better understand Jewish traditions, especially *498 those which are relevant to the Catholic religion and how those traditions relate to the Catholic religion;
11. There will be no one to fill the void in the child's life to talk to her about her father and the father's side of the family, since the child's custodians do not discuss those subjects with the child;
12. Loss of potential confidants;
13. Potential loss of sources of heredity and medical history;
14. Potential perquisites, such as gifts, trips, vacations, etc.;
15. Loss of Grant-Parental guidance in child rearing;
16. Loss of benefits which will devolve upon the child from a relationship with her Paternal Grandparents, which she can not derive [from] any other relationship;
17. The continuous love and affection of the child's Paternal Grandparents may very well mitigate the feelings of guilt or rejection, which the child may feel at the death of her mother and/or due to the separation from her natural father and ease the painful transition therefrom;
18. Loss of sources of unconditional love and acceptance, which compliment rather than conflict with the roles of the child's custodians.
The trial court said that in its view, without visitation, Raquel would "experience many, if not all, of these harms" and that it was in Raquel's "best interest" to "re-establish visitation."
In our judgment, grandparents seeking visitation under N.J.S.A. 9:2-7.1 in the wake of Moriarty must establish that denying visitation would wreak a particular identifiable harm, specific to the child, to justify interference with a parent's fundamental due process right to raise a child free from judicial interference and supervision. Conclusory, generic items, such as "loss of potentially happy memories," are not a sufficient basis to warrant such an intrusion into a parent's decision making.
There was no evidence during the trial that Raquel would experience guilt or inadequacy if visitation did not occur. Nor was there any evidence that she could experience confusion over the fact that she saw her maternal grandmother, Genevieve's mother, but not the Mizrahis. There was no evidence that as Raquel grew older, she would not be able to learn about Jewish heritage and tradition. There was no evidence that Raquel will experience a void in her life if she does not visit with the Mizrahis or that, as she got older, she would experience feelings of rejection. Nor was there any evidence that Raquel would suffer economically; there was no showing that the Cannons are unable to meet Raquel's needs.
We have no doubt that it is painful for the Mizrahis not to see Raquel, and we may empathize with them. The harm to which Moriarty, supra, refers, however, and which must be proven, is harm to the child, not harm to the grandparents. 177 N.J. at 118, 827 A.2d 203. That the Mizrahis may have had a warm relationship with Raquel until January 2001, when Raquel was three years old, does not mean that Raquel will experience harm now if visitation is not ordered.
In Moriarty, supra, the plaintiff father was acting to cut off an established relationship that had been in existence, in the case of the older child, for more than fifteen years. 177 N.J. at 119, 827 A.2d 203. Here, the Cannons have concluded that the Mizrahis' attempt to re-establish a *499 relationship was not successful and was detrimental to Raquel.
Genevieve trusted the Cannons to raise Raquel. Knowing she would not live to guide her daughter to adulthood, she selected the individuals she thought best equipped to do so. She trusted their discretion and their judgment. They have decided that forced visitation is harmful to Raquel. Plaintiffs failed to prove that harm would inure to Raquel if she did not visit the Mizrahis at this time.
This determination, that plaintiffs failed to meet their required burden of proof, makes moot the Cannons' remaining argument, that the trial court should have granted their motion for recusal.
Reversed.
NOTES
[1] Parties have spelled Ms. Cannon's name in a variety of ways. We have used the spelling found in Ms. Cannon's answer, which differs from the caption.
[2] We note that it is immaterial, for purposes of our analysis, that the judgment of adoption was entered subsequent to the trial of this matter. The trial court prudently analyzed the issue as though the adoption had been completed and the Cannons were Raquel's legal parents. The trial court specified in its judgment that it would remain in full force and effect notwithstanding completion of Raquel's adoption by the Cannons.