**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3900-16T1

C.C. and D.C.,[1]

       Plaintiffs-Appellants/
       Cross-Respondents,

v.

M.H. and S.H.,

       Defendants-Respondents/
       Cross-Appellants.

_____

       Argued October 2, 2018 – Decided January 11, 2019

       Before Judges Rothstadt, Gilson and Natali.

       On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Mercer County, Docket No. FD-11-0581-17.

       Jef D. Henninger argued the cause for appellants (Law Offices of Jef D. Henninger, Esq., attorneys; Jef D. Henninger, on the briefs).

---

[1] We refer to the adult parties by initials, and to the children by fictitious names, to protect their privacy. R. 1:38-3(d)(3).

Supti Bhattacharya argued the cause for respondents (Hill Wallack, LLP, attorneys; Supti Bhattacharya, of counsel and on the briefs; Megha R. Thakkar, on the briefs).

PER CURIAM

Plaintiffs, C.C. and D.C. appeal from the Family Part's April 6, 2017 order granting their daughter and son-in-law, defendants M.H. and S.H.'s Rule 4:6-2(e) motion to dismiss plaintiffs' complaint for grandparent visitation under the Grandparent Visitation Act, (the Act), N.J.S.A. 9:2-7.1.[2]  Defendants cross-appeal from the Family Part's May 10, 2017 order that denied their motion seeking to impose civil restraints against plaintiffs.

The trial court dismissed plaintiffs' complaint after it found that they failed to make a prima facie showing under the Act that the children would suffer harm without visitation.  It denied defendants' motion for restraints because the court did not find the restraints to be appropriate under the circumstances.

On appeal, plaintiffs argue that the trial court was obligated to conduct a plenary hearing on their complaint.  According to plaintiffs, they established a prima facie showing that it would be harmful to the children if they were not

---

[2] The complaint also alleged that plaintiffs were "psychological parents" to the grandchildren.  The trial court dismissed that claim, finding that plaintiffs could not establish one of its elements—that they lived with the children.  The dismissal of that claim is not being appealed.

allowed to visit with their grandparents, and there were material facts in dispute that needed to be resolved before the court could be in a position to decide defendants' motion to dismiss. Defendants contend the trial court properly dismissed plaintiffs' complaint, but it was an error for the court to deny their application for restraints. We disagree with both parties and affirm substantially for the reasons expressed by Judge Joseph A. Hughes in his oral decisions addressing the parties' pleadings.

I.

The salient facts gleaned from the pleadings and certifications in the record viewed in the light most favorable to plaintiffs are summarized as follows. Defendants have two children, Heather, who was three-years-old at the time the complaint was filed, and her brother Eric, who was almost two-years-old. At the time Heather was born, the parties had already not been in contact with each other due to an argument between D.C. and M.H., relating to D.C.'s relationship with S.H. They resolved their problems shortly thereafter and plaintiffs began having contact with Heather.

By September 2013, when M.H. returned to work, plaintiffs began to care for their grandchild two days per week while a nanny cared for her on the other three days. In July 2014, when the nanny took an extended trip, defendants

 A-3900-16T1

enrolled Heather in a pre-school program for three days per week, and plaintiffs provided daycare on the other two days.

Eric was born in October 2014. Soon after his birth, the parties again had an argument that interrupted plaintiffs' contact with the children until Thanksgiving of that year. M.H. returned to work in January 2015, at which time Heather continued attending school three days per week, with plaintiffs babysitting the other two days. Given Eric's young age, defendants allowed plaintiffs to watch him daily for a period of one to two weeks until he was enrolled three days a week in the same program with Heather. Plaintiffs cared for the two children on the other two days.

Until they filed this action, plaintiffs provided financial contributions to Heather and Eric in the form of gifts, parties, and other items. In September 2015, plaintiffs also paid for a family vacation to Disney World. While on the trip, the parties became embroiled in a dispute over plaintiffs' perceptions about M.H.'s relationship with S.H. and plaintiffs' babysitting responsibilities.

The dispute was followed by defendants enrolling the children in the pre-school program on a full-time basis and terminating plaintiffs' role as babysitters. Also, defendants relocated to a different nearby community. Although there was a brief period when plaintiffs provided daycare and

transportation services once a week, by September 2016, the parties' relationship reached the point where defendants terminated all contact.

Plaintiffs began seeing Dr. Les Linet, a psychiatrist, specializing in grandparent alienation issues in 2015 and again in 2016.[3] Linet never met with defendants or had any contact with the children.

After plaintiffs made unsuccessful efforts to restore contact with their grandchildren, on November 9, 2016, they filed a verified complaint for visitation and sought entry of an order to show cause for emergent relief. In their verified pleading, plaintiffs stated that they "have enjoyed a loving and caring relationship with the[ir grandchildren] since their birth on a daily basis," "seeing them multiple times per week, for vacations, etc." They described their relationship with the children as being "closely involved." They explained how they were there "when Heather was born," how they participated in "family vacations," and were always available "[w]henever . . . [d]efendants needed a babysitter on short notice or wanted to go out . . . even overnight if need be." They described how, when the children were in their care, they "fed, bathed,

---

[3] D.C. also saw Dr. Diane Rose from 2000-2005. Dr. Rose submitted a report in support of plaintiffs.

loved, and enjoyed" them and that "it is likely that the children could suffer harm should contact be denied . . . ."

Plaintiffs also certified that "[d]efendants consented to and fostered the relationship between [p]laintiffs and the children . . . ced[ing] over to [p]laintiffs a measure of parental authority and autotomy. . . ." They contended that they were the only people other than defendants who were allowed to drive the children and that they spent "countless overnights with the children, while consistently watching them for [two to three] days per week." Plaintiffs also stated that the children "spent multiple days at [plaintiffs'] house, with overnight visits, and . . . [p]laintiffs also took [them] to doctor's appointments, to and from daycare, they purchased them toys and necessities, and [p]laintiffs would vacation with them."

Plaintiffs filed additional certifications in support of their emergent application that essentially reiterated the statements made in their complaint and primarily focused on the dispute between the parties that was unrelated to the children. In D.C.'s certification, she explained that the dispute had nothing to do with the children as it was limited to arguments about how S.H. treated M.H., and how those arguments led to the termination of their contact with their grandchildren. She reiterated the description of plaintiffs' care for the

6

grandchildren, explaining how they "helped raise the children in every sense of the word[.]" She described the financial assistance they provided to their daughter and grandchildren and how they assisted by "help[ing] with doctors' visits, having photos taken[, and] taking Heather to Gymboree and music classes." In C.C.'s certification, he confirmed D.C.'s assertions and stated that by terminating plaintiffs' visitation with their grandchildren, defendants caused them and their grandchildren irreparable harm.

In addition to their certifications, plaintiffs submitted a report from Linet that explained his general opinion that "loss of contact with the grandparents has an adverse effect on grandchildren's emotional health - immediately after the loss and also as they age." He also noted that "the blocking of access and visitation between grandparents and grandchildren should be considered an emergency and possible evidence of child abuse."

The parties appeared in court on November 16, 2016. The judge who considered their application for emergent relief denied it after concluding that there was no "substantial immediate, irreparable harm" threatened to either the grandchildren or to plaintiffs and that plaintiffs did not "establish a probability of success on the merits." The judge also observed that a plenary hearing was

7

likely necessary. The matter was rescheduled for a hearing to be held on January 19, 2017.

After the initial hearing, defendants filed a motion under Rule 4:6-2(e) to dismiss plaintiffs' complaint, and, in the alternative, to allow for psychological evaluations to be performed. In addition, defendants sought the imposition of civil restraints against plaintiffs, preventing them from having contact with defendants or their children. They also filed a counterclaim, seeking the same relief set forth in their motion.

Defendants filed their certifications in opposition to plaintiffs' application and in support of their own motion that, like plaintiffs, focused on the parties' contumacious relationship. In her certification, M.H. explained that the children were not suffering any harm and that she and S.H. were not engaged in disparaging plaintiffs or in telling the children their grandparents did not wish to see them. According to M.H., on the rare occasion that Heather asked her about plaintiffs, M.H. told her that they were sick. Moreover, neither child was distressed or otherwise suffering any harm from not having contact with plaintiffs.

M.H. also described the "abusive" relationship that she and S.H. had with her parents for several years and attached numerous emails in support of her

contention. M.H. believed her parents, especially her mother, suffered from "mental illness" that caused her abusive behavior and that it was M.H.'s and S.H.'s goal to protect the children from being exposed to the same conduct plaintiffs used towards them.

M.H. also addressed the Disney World argument that led to the termination of plaintiffs' contact with the children. She stated that after the incident and their enrolling the children in full time daycare, her parents came to the house "unannounced" and "started a major argument in front of the kids. . . ." After they left, plaintiffs, through D.C., continued the dispute through "harassing communications" that included a "rage-filled rant." In an attempt to end the harassment, M.H. agreed to allow plaintiffs to resume daycare for the children one day per week. In the meantime, defendants and their children relocated to a nearby community that plaintiffs considered to be too great of a distance. Problems again developed that culminated in September 2016 when D.C. sent M.H. an email that disturbed her and when at a later meeting M.H. had with plaintiffs where they accused S.H. of trying to "kill [her] by starving [her] and then live off [her] success." Plaintiffs also alleged that S.H. was having an extramarital affair, which M.H. later confirmed was untrue.

Turning to plaintiffs' involvement with the children, M.H. contested D.C.'s description of plaintiffs' roles. According to M.H., "[t]heir roles have been limited to typical grandparents and their involvement . . . has never been anything greater than that of a babysitter who helps with the children." She stated that her son only spent one overnight with her parents and Heather approximately "[five to ten] times in four years." Also, plaintiffs took one of the children to the doctor "[three to four] times in four years" and on almost all of the occasions either M.H. or S.H. were there as well.

In response to Linet's report, M.H. explained that "[t]he reason for my not allowing my parents to see the children is because of the demonstrated harm that they have caused me, S.H., and other family members, not to alienate them." She described her and S.H.'s concern to be the result of plaintiffs "caus[ing them] extreme emotional distress and an inordinate amount of stress on [their] marriage" and that they were concerned her parents could not "remain silent about their thoughts and feelings about [S.H.], [their] marriage or [M.H.] and not share them with the children." M.H. "question[ed Linet's] true understanding of [D.C.] or the situation. He has not met S.H., [Heather or Eric], or [M.H.] and has not heard any facts other than what [D.C.] has told him."

A-3900-16T1

Finally, as to finances, M.H. explained that both she and S.H. are financially independent, they earn a substantial income and live a comfortable life without any support from plaintiffs. She explained that plaintiffs' gifts were accepted against her and S.H.'s wishes in order to avoid further escalation of their relationship with her parents.

S.H. also filed a certification in which he primarily addressed his and M.H.'s belief that D.C. suffered from mental illness that caused her to be irrational. In addition, he denied D.C.'s allegations about him having an affair and confirmed that his relationship with plaintiffs had always been difficult.

Defendants also filed a certification from M.H.'s sister. The sister stated that she sees the children at least monthly and there is no evidence that they are suffering any harm from any causes, including not seeing their grandparents. She described defendants as "loving parents who adore their children and have nothing but their best interests at heart." She also certified that her parents "have a long history of cutting off family members and at times, communicating in verbally abusive ways."

Plaintiffs filed a certification from C.C. in response to those submitted by defendants. In his statement, C.C. denied that either D.C. or he suffered from any mental illness and rejected defendants' minimization of plaintiffs' role in the

11

children's lives. C.C. also explained M.H.'s medical and psychological issues that gave reason for plaintiffs' concern about her health and her wellbeing.

Notably, C.C. stated that neither he nor D.C. claimed that either defendant was an unfit parent. He also provided letters from the children's pre-school and Heather's dance programs that noted the children were generally happy and healthy and seemed to enjoy being picked up from school by their grandparents.

D.C. also filed a reply certification that verified C.C.'s statements and confirmed the attachments to their supplemental certifications. The attachments included a letter from D.C.'s psychiatrist that stated that D.C. suffered from "anxiety and dysphoria [that were] directly caused and related to the estranged relationships with her children and the lack of contact with her grandchildren."

On January 19, 2017, following extensive oral argument, Judge Hughes reserved the matter and ordered it be relisted once he decided whether to order a plenary hearing. Plaintiffs then secured new counsel who obtained the judge's permission for the parties to file supplemental certifications.

In her supplemental certification, D.C. challenged the value of the emails attached to M.H.'s certification, argued that plaintiffs had established that they were entitled to a plenary hearing, and continued to deny defendants' allegations

12

that she suffered from any mental illness. In the remainder of the certification, D.C. challenged specific statements made by M.H.

On April 6, 2017, Judge Hughes dismissed plaintiffs' complaint seeking grandparent visitation without a plenary hearing after he placed his reasons for doing so on the record in a comprehensive and thorough oral decision. In his decision, the judge concluded that plaintiffs failed to establish a prima facie showing of harm to the children. He then reviewed the controlling legal principles applicable to the Act. Judge Hughes observed that under the applicable law, the Act is "subject to strict scrutiny" and the burden is on the "grandparent[s] . . . [to] establish[] that . . . visitation is necessary to avoid harm to the child." He stated "that absent a showing that the child would suffer harm if deprived of . . . contact with his or her grandparents, the State could not constitutionally infringe upon parental autonomy . . . ." As a result, "grandparents must first establish a prima facie case that the absence of visitation between the grandparents and children will harm the children . . . ." According to the judge, "harm . . . [refers to] an identifiable harm specific to the child."

Turning to the parties' submissions, Judge Hughes observed that plaintiffs focused upon their close relationship with the children "and the alleged harm

that would result if the children were deprived of that relationship." According to the judge, plaintiffs relied on M.H. telling Heather her grandparents were sick when she asked about their whereabouts and Linet's report. The judge did not find either of those satisfied plaintiffs' burden. With regard to M.H. telling the children that plaintiffs were sick, the judge noted that the "dialogue relates squarely to the constitutionally protected judgment and fundamental rights of these natural and fit parents." As to Linet's report, the judge observed there was no dispute that the doctor had no contact with the children or defendants and could not establish particular harm to the children.

Judge Hughes also pointed out that plaintiffs never contended that defendants were unfit parents. He noted that it was not contested that "the relationship between [the parties] ha[d] deteriorated and [was] very badly damaged," but that "[t]he issue is the characterization of th[e] relationship" between the grandparents and the children, not the parties.

The judge addressed plaintiffs' claim for visitation under the Act and their contention that they made a prima facie showing that entitled them to relief. He reviewed the facts and the Supreme Court's holding in Major v. Maguire, 224 N.J. 1 (2016), and applied them to M.H.'s statement to Heather that her grandparents were not visiting her because they were sick. He determined that

the facts in the present case were distinguishable from <u>Major</u> and after again giving plaintiffs "all reasonable inferences," concluded that plaintiffs failed to demonstrate any identifiable harm to the children because plaintiffs' "assertions d[id] not identify a harm to these particular children if there is no grandparent visitation allowed." He again observed that there was no allegation plaintiffs were unfit and described defendants as "married and an intact family unit, co-parenting their children . . . [and] are also united in their opposition to any grandparent visitation."

Turning to defendant's claim for civil restraints, he postponed the decision to allow counsel to discuss the matter further with the hope that they could resolve that claim. When he was later informed that the parties could not reach an agreement, Judge Hughes denied defendants motion and dismissed their counterclaim for civil restraints on May 10, 2017. As stated in his oral decision placed on the record on May 1, 2017, the judge found the imposition of civil restraints be "inappropriate." These appeals followed.

II.

Our review of an order of dismissal under <u>Rule</u> 4:6-2(e) "is plenary and we apply the same test as the" trial court. <u>Major</u>, 224 N.J. at 26 (quoting <u>Smerling v. Harrah's Entm't, Inc.</u>, 389 N.J. Super. 181, 186 (App. Div. 2006)).

A-3900-16T1

The "Rule affords to plaintiffs 'every reasonable inference of fact'; a reviewing court 'searches the complaint in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim, opportunity being given to amend if necessary.'" Ibid. (quoting Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746 (1989)).

Where, as here, a Rule 4:6-2(e) motion involves the "consider[ation of] factual allegations made by the parties in certifications outside the pleadings[, we are] required to apply the standard governing summary judgment motions in Rule 4:46-2(c)." R.K. v. D.L., 434 N.J. Super. 113, 121 (App. Div. 2014) (citing Roa v. Roa, 200 N.J. 555, 562 (2010)) (holding that a trial court "erred in granting [a parent's] motion to dismiss because the record show[ed] the parties' . . . disagreements [were] rooted in their seemingly irreconcilable perceptions of how . . .tragic events . . . affected [the child's] emotional wellbeing"). "Our review of a summary judgment ruling is de novo. We apply the same standard as the trial court." Conley v. Guerrero, 228 N.J. 339, 346 (2017). "That is, summary judgment will be granted if there is no genuine issue of material fact and 'the moving party is entitled to a judgment or order as a matter of law.'"

Ibid. (quoting Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016)).

Applying that standard here, we conclude Judge Hughes correctly determined that there was no evidence presented by plaintiffs that established the requisite showing of particular, "concrete harm," see Daniels v. Daniels, 381 N.J. Super. 286, 294 (App. Div. 2005), to either child that would justify a finding that plaintiffs overcame the presumption against interference with defendants' fundamental rights to parent. Parental autonomy in decisions regarding the "care, custody and control of their children" is a fundamental right that will only yield to a compelling state interest. Moriarty v. Bradt, 177 N.J. 84, 103 (2003). The probability that a child will suffer serious psychological or physical harm provides grounds for interference with parental autonomy under the doctrine of parens patriae. Id. at 112-13.

Under the Act, grandparents seeking visitation over the objection of a fit parent must prove by a preponderance of the evidence "that visitation is necessary to avoid harm to the child." Id. at 117. Only "[i]f . . . the potential for harm has been shown[] [can] the presumption in favor of parental decision making . . . be deemed overcome." Slawinski v. Nicholas, 448 N.J. Super. 25, 33 (App. Div. 2016) (quoting Moriarty, 177 N.J. at 117).

A-3900-16T1

"[G]randparents seeking visitation . . . must prove by a preponderance of the evidence that denial of the visitation they seek would result in harm to the child." Ibid. (quoting Moriarty, 177 N.J. at 88). "Substantively, it is a 'heavy burden.'" Id. at 34 (quoting Major, 224 N.J. at 18).

In Slawinski, we described the level of harm that a grandparent must demonstrate before a court is required to determine whether visitation is in a child's best interest. We stated:

> [P]roof of harm involves a greater showing than simply the best interests of the child. [Moriarty], 177 N.J. at 116 (stating that a dispute between a "fit custodial parent and the child's grandparent is not a contest between equals[,]" consequently "the best interest standard, which is the tiebreaker between fit parents, is inapplicable") . . . . The harm to the grandchild must be "a particular identifiable harm, specific to the child." Mizrahi v. Cannon, 375 N.J. Super. 221, 234 (App. Div. 2005). It "generally rests on the existence of an unusually close relationship between the grandparent and the child, or on traumatic circumstances such as a parent's death." [Daniels, 381 N.J. Super. at 294]. By contrast, missed opportunities for creating "happy memories" do not suffice. Mizrahi, 375 N.J. Super. at 234. Only after the grandparent vaults the proof-of-harm threshold will the court apply a best-interests analysis to resolve disputes over visitation details. Moriarty, 177 N.J. at 117.
>
> [Slawinski, 448 N.J. Super. at 34.]

The Court in <u>Moriarty</u> provided the following examples of the type of supporting evidence that grandparents can produce in an attempt to establish harm to a child:

> The grandparents' evidence can be expert or factual. For example, they may rely on the death of a parent or the breakup of the child's home through divorce or separation . . . . In addition, the termination of a long-standing relationship between the grandparents and the child, with expert testimony assessing the effect of those circumstances, could form the basis for a finding of harm.
>
> [<u>Moriarty</u>, 177 N.J. at 117.]

Where a grandparent cannot make a threshold showing of harm, the complaint should be dismissed. A trial court "should not hesitate to dismiss an action without conducting a full trial if the grandparents cannot sustain their burden to make the required showing of harm." <u>Major</u>, 224 N.J. at 25. Under those circumstances, "a court may dismiss . . . by summary judgment under <u>Rule</u> 4:46-2(e) . . . [so as] not [to] prolong litigation that is clearly meritless." <u>Ibid.</u>

Plaintiffs here clearly established they enjoyed a mutually enjoyable relationship with their young grandchildren. It is unfortunate that their dispute with defendants have led to a termination of their involvement in their grandchildren's lives at this time. However, giving plaintiffs every reasonable inference of fact, their pleadings and certifications failed to establish any harm

to either child. By all accounts, the children are happy and healthy and not suffering from any harm as a result of not having contact with their grandparents or otherwise.

Linet's report expressing his opinion generally about the effects of grandparent separation from grandchildren provided no basis for a finding of "concrete" particular harm to the children in this case. To be probative of harm, an expert's opinion must be "based on facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts in forming opinions on the same subject[.]" Davis v. Brickman Landscaping Ltd., 219 N.J. 395, 410 (2014); see also N.J. Div. of Child Protection & Permanency v .T.U.B., 450 N.J. Super. 210, 242 (App. Div. 2017) ("[An] expert's testimony may not be used as a conduit to establish facts that are not independently supported by competent evidence. If an expert opinion is based on a fact not in evidence, its persuasiveness is greatly undermined"). Linet's only reference to children that he has never met is in a discussion within his report that assumes defendants have been disparaging plaintiffs to the children. His assumption is unsupported and belied by the undisputed volatile history of the parties' relationship that did not result in any

evidence that defendants ever disparaged plaintiffs to the children prior to or after contact was terminated. There is nothing in the record to demonstrate any harm to the children.

Moreover, Linet's report itself cautions against "professionals involved in cases of unwarranted estrangement" from having their "judgments . . . influenced by initial information" from the "assessment of a mental health professional," such as Linet, who has not had contact with all of the parties and who presents an unsupported biased report. Even less probative of any harm was the additional report from D.C.'s treating psychiatrist, Rose, who also never met defendants or the children and merely attested to D.C.'s mental health history and treatment. Finally, as Judge Hughes found, M.H.'s explanation to Heather about her grandparent's absence, far from disparaging, did not rise to the level of harm that must be shown in order for a grandparent's complaint to withstand a motion as to dismiss.

Because we conclude that Judge Hughes correctly determined that plaintiffs failed to meet their initial burden, we find no error in his decision to dismiss the complaint without a plenary hearing.

A-3900-16T1

## III.

We turn to defendants' cross-appeal and their contention that Judge Hughes' denial of civil restraints in this matter exposed the children to a risk of harm and stress. We find no merit to their argument.

Family courts are courts of equity. <u>Randazzo v. Randazzo</u>, 184 N.J. 101, 113 (2005). While "[Family Part judges'] equitable discretion is not governed by fixed principles and definite rules, '[i]mplicit [in the exercise of equitable discretion] is conscientious judgment directed by law and reason and looking to a just result.'" <u>Kaye v. Rosefielde</u>, 223 N.J. 218, 231 (2015) (quoting <u>In re Estate of Hope</u>, 390 N.J. Super. 533, 541 (App. Div. 2007)). Moreover,

> [b]ecause of the family courts' special jurisdiction and expertise in family matters . . . [and the fact that] the Legislature "has reposed grave responsibilities on Family Part judges to ensure the safety and well-being of [men,] women[,] and children in our society[,] . . . [w]e are confident that they can successfully balance the interests of society in . . . caring for families."
>
> [<u>Cesare v. Cesare</u>, 154 N.J. 394, 413 (1998) (quoting <u>Brennan v. Orban, Jr.</u>, 145 N.J. 282, 304-05 (1996)).]

Family Part judges' responsibilities include, where appropriate the resolution of "[d]isputes which do not rise to the level of domestic violence . . . ." <u>N.B. v. T.B.</u>, 297 N.J. Super. 35, 42 (App. Div. 1997). We review a trial

judge's decision to grant or withhold equitable relief for an abuse of discretion, so long as the decision is consistent with applicable legal principles. <u>Marioni v. Roxy Garments Delivery Co.</u>, 417 N.J. Super. 269, 275-76 (App. Div. 2010).

Applying these guiding principles here, we discern no abuse of the judge's discretion by denying civil restraints under the circumstances presented in this matter. Suffice it to say, we discern no facts in the record upon which to conclude plaintiffs are posing any threat of harm to the children or, for that matter, to defendants that warrant the imposition of restraints and with it, continued court supervision. Defendants' complaints about unwanted cards and letters that can be thrown away, or phone calls that need not be answered, do not provide, as Judge Hughes found, appropriate circumstances for restraints in this matter.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3900-16T1