**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0282-25

T.C. and D.C.,

    Plaintiffs-Appellants,

v.

S.F. and R.F.,

    Defendants-Respondents.

_____

Submitted June 1, 2026 – Decided June 24, 2026

Before Judges Natali and Bergman.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FD-04-0325-25.

Hegge & Confusione, LLC, attorneys for appellants (Michael Confusione, of counsel and on the brief).

Joseph Basso, attorney for respondents.

PER CURIAM

Plaintiffs T.C.[1] and D.C. appeal from a Family Part order granting a directed verdict to defendants S.F. and R.F. and dismissing their complaint for grandparent visitation with their grandchild, A.R.F. ("Anissa"). After our review of the record and application of the relevant legal principles, we affirm.

I.

Plaintiffs are the maternal grandparents of Anissa, born in 2018. Defendants are her paternal grandparents. Following the death of the child's biological father and the termination of the biological mother's parental rights, defendants legally adopted Anissa in April 2022. The adoption was undertaken with the consent of the biological mother, who is not a party to this litigation.

The record exhibits that after the child's birth, both of her parents struggled with addiction, leading to the grandparents being involved in the child's care. Anissa initially lived with plaintiffs from January 2018, until the end of April 2018, at which time she began to reside with defendants. Defendants provided for the primary care of Anissa and plaintiffs maintained a role as visiting grandparents. Defendants maintained because of the termination of parental rights of the child's biological mother, the parties had a mutual

---

[1] To protect the privacy interests of the child, we use initials and pseudonyms for her and the parties. R. 1:38-3(d)(13).

A-0282-25

understanding that Anissa was to have no contact with her, and she was not to be discussed in Anissa's presence.

From April 2018 through July 2024, plaintiffs had regular contact with the child, including biweekly weekend visits, weekly video calls, and extended visits during summers and school breaks. The plaintiffs also maintained a dedicated bedroom for the child in their home. The visitation arrangement was based on mutual agreement and the parties' schedules. No court order was entered related to this parenting arrangement.

In July 2024, during their visitation, plaintiffs allegedly permitted Anissa to have contact with her biological mother. As a result of this incident, defendants proposed written conditions to plaintiffs' visitation with the child; specifically prohibiting any contact with or discussion concerning the child's biological mother during their visitation. Plaintiffs declined to sign the agreement and offered a counterproposal that was unacceptable to defendants.

After the failure to reach an agreement, defendants terminated plaintiffs' visitation with the child. As a result, plaintiffs initiated a complaint in the Family Part, seeking grandparent visitation. In their complaint, plaintiffs requested the prior visitation schedule be restored, including biweekly visits, weekly video calls, and extended holiday and summer visits. Defendants

3

opposed the application, asserting as the child's legal parents, they had the right to determine with whom the child associates and that plaintiffs had not demonstrated the legal requirements to override their parental autonomy.

Hearings were held before the trial court on May 8 and July 23, 2025. At those proceedings, plaintiffs testified on their own behalf and presented the testimony of a family member. They outlined the history of their relationship with the child, the nature and frequency of their contact and their belief that the child would be harmed by the abrupt cessation of the relationship.

At the close of plaintiffs' case-in-chief, defendants moved for judgment at trial pursuant to Rule 4:40-1.[2] The trial court granted the motion, finding that plaintiffs had not met their burden to demonstrate by a preponderance of the evidence that denial of visitation would result in "identifiable harm" to the child. The trial court noted that when specifically asked to identify specific harm, plaintiffs could only "discuss[] memories, [including] multiple references to a trip to Niagara Falls, and indicated it would be an emotional harm if grandparent visitation were not allowed." Additionally, the court referenced the lack of expert testimony regarding identifiable harm to the child. The court concluded

---

[2] A Rule 4:40-1 motion is commonly referred to as a motion for a "directed verdict." The record shows that defendants erroneously phrased their motion as a motion for summary judgment.

that, absent a showing of specific, identifiable harm, plaintiffs failed to carry their burden to support their application for visitation and dismissed the complaint.

On appeal, plaintiffs contend the court improperly dismissed their complaint by way of directed verdict because they had established identifiable harm to the child through evidence adduced at the hearing and, in addition, that the trial court erroneously determined expert testimony was required to prove such harm.

II.

In reviewing a motion for involuntary dismissal under Rule 4:37-2(b) or a motion for judgment under Rule 4:40-1, we apply the same standard that governs the trial courts. ADS Assocs. Grp. v. Oritani Sav. Bank, 219 N.J. 496, 511 (2014). The foregoing standard requires "'[i]f, accepting as true all the evidence which supports the position of the party defending against the motion and according him the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ, the motion must be denied[.]'" Verdicchio v. Ricca, 179 N.J. 1, 30 (2004) (quoting Estate of Roach v. TRW, Inc., 164 N.J. 598, 612 (2000)).

A-0282-25

The motion should only "be granted where no rational [factfinder] could conclude that the plaintiff marshaled sufficient evidence to satisfy each prima facie element of a cause of action." Godfrey v. Princeton Theological Seminary, 196 N.J. 178, 197 (2008). We review de novo a trial court's decision on these motions, applying the same standard as the trial court. Ibid.

Applications for grandparent visitation are governed by N.J.S.A. 9:2-7.1, which requires that grandparents seeking visitation over the objection of a fit parent must prove by a preponderance of the evidence "that visitation is necessary to avoid harm to the child." Moriarty v. Bradt, 177 N.J. 84, 117 (2003). Only "[i]f the court agrees that . . . the potential for harm has been shown[] [can] the presumption in favor of parental decision making []. . . be deemed overcome." Slawinski v. Nicholas, 448 N.J. Super. 25, 33 (App. Div. 2016) (quoting Moriarty, 177 N.J. at 117). "Substantively, it is a 'heavy burden.'" Id. at 34 (quoting Major v. Maguire, 224 N.J. 1, 18 (2016)). Thus, a grandparent must make "a clear and specific allegation of concrete harm to the [child]." Daniels v. Daniels, 381 N.J. Super. 286, 294 (App. Div. 2005).

Additionally, the alleged harm must be "significant" enough to "justify[] State intervention in the parent-child relationship." Id. at 293. "Mere general and conclusory allegations of harm . . . are insufficient." Id. at 294. The purpose

6

behind this heightened pleading requirement is "to avoid imposing an unnecessary and unconstitutional burden on fit parents who are exercising their judgment concerning the raising of their children[.]" Ibid. Otherwise, "any grandparent could impose the economic and emotional burden of litigation on fit parents, and on the children themselves, merely by alleging an ordinary grandparent-child relationship and its unwanted termination." Id. at 293.

In Slawinski, we described the level of harm that a grandparent must demonstrate, stating:

> [P]roof of harm involves a greater showing than simply the best interests of the child. Moriarty, 177 N.J. at 116 (stating that a dispute between a "fit custodial parent and the child's grandparent is not a contest between equals[,]" consequently "the best interests standard, which is the tiebreaker between fit parents, is inapplicable"). . . . The harm to the grandchild must be "a particular identifiable harm, specific to the child." Mizrahi v. Cannon, 375 N.J. Super. 221, 234 (App. Div. 2005). It "generally rests on the existence of an unusually close relationship between the grandparent and the child, or on traumatic circumstances such as a parent's death." Daniels, 381 N.J. Super. at 294. By contrast, missed opportunities for creating "happy memories" do not suffice. Mizrahi, 375 N.J. Super. at 234. Only after the grandparent vaults the proof-of-harm threshold will the court apply a best-interests analysis to resolve disputes over visitation details. Moriarty, 177 N.J. at 117.
>
> [Slawinski, 448 N.J. Super. at 34 (second alteration in original) (citations reformatted).]

7

A "trial court should not hesitate to dismiss an action without conducting a full trial if the grandparents cannot sustain their burden to make the required showing of harm." Major, 224 N.J. at 25.

At trial, plaintiffs presented their own testimony, and that of another relative witness, asserting that Anissa would suffer harm if they were not permitted to exercise visitation. The testimony and evidence presented by plaintiffs substantially focused on the positive relationship between them and Anissa. D.C. testified to several activities they did together and that he believed Anissa would miss them if visitation ceased. T.C. similarly testified to the informal visitation arrangement, the activities, and traditions she shared with Anissa and the close emotional bond between them. Additionally, she noted that Anissa was always reluctant to leave their home after her visits. She also testified to the incident that led to the cessation of visits, which she described as an unplanned, brief encounter between Anissa and her biological mother.

On cross examination, T.C. admitted that the harm to Anissa by not having contact with them was based entirely on her own opinion and experience, not on expert opinion or any documented evidence. She conceded that the emotional harm she feared was the loss of a loving relationship with the child, but she

8

could not identify any specific, measurable harm to Anissa should visitation be denied.

The non-party witness called by plaintiffs testified to observing Anissa's positive and loving interactions with plaintiffs during her visits. However, she conceded she had no professional expertise and could not offer an opinion on identifiable harm if visitation ceased.

Plaintiffs maintain the abrupt severance of their relationship with Anissa without consideration of her emotional needs will harm her. Plaintiffs also posit several arguments that visitation with them would be in Anissa's "best interests."

Based on our de novo review of the record, we conclude plaintiffs' trial evidence, even when providing them all favorable inferences, failed to set forth a prima facie case of specific, identifiable harm to Anissa if they were not granted visitation. While we are understanding of the difficult circumstances regarding the death of the child's biological father and the drug-related issues with the biological mother resulting in the termination of her parental rights and the resultant adoption of Anissa by defendants, the record evidence from plaintiffs' fails to demonstrate sufficient and specific identifiable harm to Anissa.

9

Specifically addressing plaintiffs' argument that terminating visitation would harm Anissa because it would not be in her best interests, our Supreme Court in Moriarty held a "best interests of the child" analysis concerning visitation is only required once "harm has been shown" to overcome "the presumption in favor of parental decision making." 177 N.J. at 117 (citations omitted). This extra hurdle was intended to be a heavy burden not met simply by alleging the child's best interests are not met based on theoretical emotional harm. Here, plaintiffs' allegations of emotional harm did not satisfy their burden to show particular identifiable harm that is specific to the child as required in order for the court to reach a best interests analysis.

We now turn to plaintiffs' contention that the trial court erred by finding expert testimony was required to show specific harm to Anissa. Based on our review of the record, we conclude plaintiffs' argument is misplaced. The record shows that the court found "[t]here was no expert testimony concerning any identifiable harm and the harm alleged by [p]laintiffs was limited to the types of generic harm specifically identified by the court in Mizrahi." We conclude the court did not specifically find that expert testimony was required to prove harm to the child as asserted by plaintiffs. The court referenced the undisputed fact that plaintiffs did not offer expert testimony to support their claims that the child

would be harmed if they were not permitted to exercise visitation, and dismissed their complaint after consideration of their proofs, not because of their failure to provide expert testimony.

To the extent we have not addressed any of plaintiffs' remaining arguments, we conclude those arguments are without sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

11
A-0282-25