**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1141-23

L.N. and C.N.,

    Plaintiffs-Appellants,

v.

B.R.,

    Defendant-Respondent.

_____

Argued June 4, 2024 – Decided July 8, 2024

Before Judges Gooden Brown and Haas.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Sussex County, Docket No. FD-19-0083-24.

Melissa M. Ruvolo argued the cause for appellants (Family Focused Legal Solutions, Ruvolo Law Group, LLC, attorneys; Melissa M. Ruvolo, of counsel and on the briefs; Sofia M. Marsella, on the briefs).

Paris P. Eliades argued the cause for respondent (Paris P. Eliades Law Firm, LLC, attorneys; Paris P. Eliades, of counsel and on the brief; Amy F. Gjelsvik, on the brief).

PER CURIAM

Plaintiffs L.N.[1] and C.N. appeal from the November 1, 2023, Family Part order dismissing their complaint[2] against defendant B.R. for joint legal custody of their grandson and defendant's son, R.R., because they failed to demonstrate they were R.R.'s psychological parents. We reverse and remand for a plenary hearing.

Defendant was in a dating relationship with plaintiffs' daughter who became pregnant with R.R. During their relationship, the couple lived with plaintiffs. Tragically, on November 3, 2021, plaintiffs' daughter died unexpectedly during childbirth. Defendant brought R.R. home from the hospital and continued to live in plaintiffs' home for approximately two years. During the two years, defendant worked as a truck driver for plaintiffs' trucking company and plaintiffs provided care for R.R., including childcare while defendant worked.

The arrangement between the parties was mutually satisfactory for a significant period of time. However, eventually, the relationship soured, and,

---

[1] We use initials to protect the confidentiality of the child. R. 1:38-3(d)(13).

[2] Although the November 1, 2023, order lists L.N. as the only plaintiff, in the complaint, both L.N. and C.N. are identified as plaintiffs.

A-1141-23

ultimately, on October 6, 2023, after plaintiffs returned with R.R. from a two-month trip to Florida, defendant packed his belongings and moved out of plaintiffs' home with R.R. Ten days later, on October 16, 2023, plaintiffs filed an order to show cause (OTSC) and a verified complaint under the Non-Dissolution (FD) docket, seeking temporary restraints and "joint legal custody and primary residential custody" of R.R. The complaint did not request grandparent visitation. Defendant opposed the application and cross-moved for other relief not pertinent to this appeal. To support their respective positions, the parties submitted dueling certifications disputing the extent of plaintiffs' care of R.R. and their role in R.R.'s life.

Specifically, L.N. certified that she and C.N. had been R.R.'s "de facto parents" and that she had "performed virtually all day-to-day care for . . . the past two . . . years." She averred that defendant "repeatedly state[d] that he wanted [her] and [her] husband to raise [R.R.]." L.N. characterized defendant's presence in R.R.'s life as sporadic, stating that defendant would "stay at [his girlfriend's] house most nights of the week," and when he was at their home, he would "sleep in [their daughter's] bedroom" while R.R. would "sleep in [plaintiffs'] bedroom" with them. According to L.N., defendant "would occasionally stop over [their] house" and "play with [R.R.] for a short time"

before "leav[ing] again." L.N. stated that on occasion, when defendant became angry, he would "threaten to take [R.R.] away from [them]." L.N. also declared that defendant would sometimes "bring [R.R.] to [defendant's] mother's house in Pennsylvania and not advise [plaintiffs] when he was going to return [R.R.]."

L.N. attested that defendant eventually "followed through on his threat" on October 6, 2023, when he "abruptly whisked [R.R.] out of the house," claiming "that he was taking [R.R.] to his mother's home in Pennsylvania to visit." According to L.N., defendant "has since refused to respond to any text messages or phone calls" about R.R.'s return. L.N. added that although defendant may attribute his actions to anger over plaintiffs keeping R.R. in Florida for two months purportedly without defendant's consent, on the contrary, "[d]efendant was fully aware of [their] plans, consented to [R.R.] accompanying [them] to Florida, and at no point during [their] trip did he request that [they] bring [R.R.] back to New Jersey," inquire about R.R.'s wellbeing, "or even request to speak with him on the phone or via Facetime" (italicization omitted).

In his certification, defendant disputed L.N.'s assertions, describing them as "self-serving statements and lies." Defendant denied stating that he wanted plaintiffs to raise R.R., and averred that he "never consented to or fostered a parental relationship between" R.R. and plaintiffs. Defendant certified that he

4

was "always home," that he and R.R. stayed in plaintiffs' daughter's room together, and that even though plaintiffs helped care for his son, he "did not shy away from taking care of" R.R.'s daily needs. He stated that L.N. would prevent him from parenting his son by "physically grab[bing] [R.R.] away" when he tried to feed him, and "refus[ing] to allow [defendant] to bathe" R.R or change his diaper. Defendant claimed further that plaintiffs engaged in "deceit and trickery" to try to "exclude [him] from [his] son's life," and stated that he found a "tracking device hidden in [his] personal diaper bag" that was registered to another one of plaintiffs' daughters (emphasis omitted).

Finally, defendant denied consenting to plaintiffs' two-month trip to Florida with R.R. Instead, defendant averred that he "freely gave [his] permission for two weeks," but "did not give them consent" to take away his son for "nearly two . . . months" and was "worried that they would try and keep him in Florida" (emphasis omitted). Defendant claimed that while they were in Florida, he "always asked about [R.R.]," and talked to R.R. on FaceTime. According to defendant, after plaintiffs continuously extended the trip, he finally demanded that they bring R.R. home. When plaintiffs returned from Florida on October 5, 2023, defendant confirmed that he packed up and moved out of plaintiffs' home with R.R. the next day.

A-1141-23

In a reply certification, L.N. described defendant's accusations as "unbelievable lies." In support, L.N. submitted screen shots of text messages with defendant's mother describing L.N.'s care of R.R. as "fantastic" and "[a]wesome," photographs of R.R.'s haircuts, and receipts for expenses plaintiffs incurred for R.R. without reimbursement. L.N. also submitted a Mother's Day card in which defendant purportedly referred to L.N. as a "bonus mom" (emphasis omitted).

On October 17, 2023, the motion judge issued an order and accompanying written statement of reasons denying plaintiffs' request for emergent relief and converting the application to a regular motion. On November 1, 2023, the judge conducted oral argument on the motion, during which plaintiffs' counsel reaffirmed that plaintiffs were seeking custody based on their role as psychological parents. Counsel specified that "this [was] more than just . . . a grandparent visitation case[] because of more than just a typical grandchild relationship."

Relying on the parties' certifications, the judge issued an order and oral opinion on the same day denying plaintiffs' application for custody of R.R. and dismissing plaintiffs' complaint. The judge determined that plaintiffs could not make a prima facie showing of psychological parenthood because although

A-1141-23

plaintiffs "did live with the child," defendant also lived in the home with R.R., never consented to plaintiffs "rais[ing R.R.]," and "did not allow them to be [R.R.'s] primary caregivers." According to the judge, although plaintiffs "assisted with [R.R.'s] needs," their actions were typical of grandparents and did not "rise[] to the level of being a primary caregiver" because they did not perform "the parental functions to [a] significant degree." As such, the judge explained that as R.R.'s parent, defendant had the right to take his son and "go live somewhere else." As to any bond, although the judge assumed that plaintiffs had a relationship with R.R., the judge found there was no "expert evaluation[] indicating there[ was] a bond."

The judge also determined that plaintiffs did not make "a prima facie showing that they should have grandparent[] visitation," stating:

> Where there's an application for grandparent[] visitation, the applicant needs to show that there'd be harm to the child, if visitation wasn't imposed.
>
> I also don't find that the plaintiff has shown that there would be harm to the child, if there was no [c]ourt ordered visitation.
>
> . . . .
>
> . . . [L]egally, I don't find that I can impose an order, ordering visitation.

The judge entered a memorializing order and this appeal followed.

7

On appeal, plaintiffs argue the judge "incorrectly interpreted and misapplied the law on psychological parentage." Plaintiffs assert the judge "failed to fully analyze and assess [p]laintiff[s'] application" under V.C. v. M.J.B., 163 N.J. 200 (2000), placed outsized emphasis on the fact that "[d]efendant was also living in the home with [plaintiffs]," and made findings "based on dueling and conflicting papers and without the benefit of testimony from the parties." We agree.

A reviewing court should not disturb the "factual findings and legal conclusions of the trial judge unless [it is] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Cesare v. Cesare, 154 N.J. 394, 412 (1998) (alteration in original) (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)). We accord special deference to the findings of fact made by the Family Part because of that court's expertise in family matters. Id. at 413. Deference is appropriate where the evidence is "largely testimonial and involves questions of credibility" because the trial court is in the best position to evaluate the veracity of the witnesses. P.B. v. T.H., 370 N.J. Super. 586, 601 (App. Div. 2004). Even when a court denies a request for child custody without a plenary hearing, the denial is reviewed for an abuse of

discretion, with deference to the expertise of the Family Part judge. <u>Costa v. Costa</u>, 440 N.J. Super. 1, 4 (App. Div. 2015). However, we review issues of law de novo, including issues arising in a custody dispute. <u>R.K. v. F.K.</u>, 437 N.J. Super. 58, 61 (App. Div. 2014).

In <u>W.M. v. D.G.</u>, 467 N.J. Super. 216 (App. Div. 2021), we outlined the rights of parents vis-a-vis third parties in a custody dispute.

> "[T]he right of parents to the care and custody of their children is not absolute." [<u>V.C.</u>, 163 N.J. at 218]. While there is a presumption supporting a natural parent's "right to the care, custody, and control of his or her child," this "presumption in favor of the parent will be overcome by 'a showing of gross misconduct, unfitness, neglect, or "exceptional circumstances" affecting the welfare of the child[.]'" <u>K.A.F. v. D.L.M.</u>, 437 N.J. Super. 123, 131-32 (App. Div. 2014) (quoting [<u>Watkins v. Nelson</u>, 163 N.J. 235, 246 (2000)]). An exceptional circumstance that overrides the presumption favoring the natural parent occurs when a third party has become a child's "psychological parent," i.e., where "a third party has stepped in to assume the role of the legal parent who has been unable or unwilling to undertake the obligations of parenthood." <u>V.C.</u>, 163 N.J. at 219 (citing <u>Sorentino v. Fam. & Child.'s Soc. of Elizabeth</u>, 72 N.J. 127, 132 (1976)). The exceptional circumstances element is grounded in the court's power of parens patriae to protect minor children from serious physical or psychological harm. <u>Watkins</u>, 163 N.J. at 246-47.
>
> [<u>W.M.</u>, 467 N.J. Super. at 230 (third alteration in original).]

Critically, only a third party who has stepped in to assume the obligations of parenthood has standing to raise a psychological parenthood claim. In V.C., our Supreme Court set forth a four-part test for a third party to prove psychological parenthood. 163 N.J. at 223. First, the petitioner must show that the biological parent "'consented to, and fostered, the petitioner's formation and establishment of a parent-like relationship with the child.'" Ibid. (quoting In re Custody of H.S.H.-K., 533 N.W.2d 419, 421 (Wis. 1995)). The term "fostered" means "that the legal parent ceded over to the third party a measure of parental authority and autonomy and granted to that third party rights and duties vis-a-vis the child that the third party's status would not otherwise warrant." Id. at 224. Also, "consent" will have different meanings under different scenarios. Id. at 223 n.6.

Second, the petitioner must show that "'the petitioner and the child lived together in the same household.'" Id. at 223 (quoting H.S.H.-K., 533 N.W.2d at 421). Third, the petitioner must have "'assumed the obligations of parenthood by taking significant responsibility for the child's care, education and development . . . without expectation of financial compensation." Ibid. (quoting H.S.H.-K., 533 N.W.2d at 421). The court should evaluate "the nature, quality, and extent of the functions undertaken by the third party and the response of the

10

child to that nurturance." Id. at 226. Fourth, the petitioner must have been in a parental role for a length of time that was sufficient to have created a bond with the child that was parental and dependent in nature. Ibid.

The Court explained that what "is crucial . . . is not the amount of time but the nature of the relationship." Ibid. The bond between a psychological parent and the child need not be the same as or stronger than that of the bond between the biological parents and the child. See id. at 226-27. Notably, proof of the parent-child bond is critically important and requires expert testimony. Ibid. In fact, the only prong of the psychological parent test requiring expert testimony is the fourth prong. Id. at 223, 227.

Overall, the four-prong analysis is fact-sensitive. Id. at 223. "A third party establishing exceptional circumstances by proving psychological parentage 'may rebut the presumption in favor of a parent seeking custody even if he or she is deemed to be a fit parent.'" W.M., 467 N.J. Super. at 231 (quoting Watkins, 163 N.J. at 247-48). If successfully proven, a third party who is considered to be a psychological parent will be placed "in parity" with a legal parent for the purposes of a custody determination. V.C., 163 N.J. at 227-28, 230. Importantly, once a third party is "in parity" with the legal parent, the third party "stands in the shoes of [the biological] parent" and the court must then

11

conduct a best interests analysis under N.J.S.A. 9:2-4(c).  Watkins, 163 N.J. at 254.  Stated differently, after deciding the psychological parenthood issue, the court must then decide whether the award of custody or visitation to the third party would "promote the best interests of the child."  Ibid.  In that regard, the court should focus on the "safety, happiness, physical, mental and moral welfare of the child."  Beck v. Beck, 86 N.J. 480, 497 (1981) (quoting Fantony v. Fantony, 21 N.J. 525, 536 (1956)).

When an analysis of the child's best interests demonstrates that both the biological parent and the psychological parent are equally capable of caring for the child, custody will be awarded to the biological parent and visitation to the psychological parent.  V.C., 163 N.J. at 228.  Thus, pursuant to N.J.S.A. 9:2-4, the court may enter an order that:  provides joint custody of the child to both parents with provisions for residential arrangements that allow the child to reside with one parent or with both and, also, provisions for decision-making with regard to the child; awards sole custody to one parent with parenting time for the non-custodial parent; or sets forth any other custody arrangement as the court determines is in the best interests of the child.

Here, the judge did not conduct a robust analysis of the required four-prong psychological parenthood test to determine whether plaintiffs' challenge

to defendant's custody satisfied the legal requirements. Rather, the judge made conclusionary statements based on conflicting certifications without eliciting any testimony, hearing from experts, or considering further evidence. We acknowledge that plaintiffs filed their OTSC and verified complaint under the FD docket. The FD docket allows actions by non-parent relatives seeking custody. B.C. v. N.J. Div. of Child Prot. & Permanency, 450 N.J. Super. 197, 201 (App. Div. 2017). Typically, the court handles an FD matter in a summary fashion to promote the "'purpose of swiftly and effectively disposing of matters which lend themselves to summary treatment.'" W.M., 467 N.J. Super. at 233 (quoting R.K. v. D.L., Jr., 434 N.J. Super. 113, 133 (App. Div. 2014)).

Nevertheless, as we explained in W.M., where the plaintiff has "raised a credible claim of psychological parenthood," the matter should not be treated summarily. Id. at 234; see also N.J. Div. of Child Prot. & Permanency v. C.S., 432 N.J. Super. 224, 226-29 (App. Div. 2013) (explaining the parties were required to obtain bonding evaluations considering the best interests of the child where the grandparents sought custody of their grandchild under an FD docket).

Based upon the record before us, we conclude plaintiffs raised a credible claim of psychological parenthood under the four-part test established in V.C. Although "[e]stablishing psychological parenthood is not an easy task" and the

13

V.C. standards "should be scrupulously applied in order to protect the legal parent-child relationship," 163 N.J. at 230, the matter should not have been treated summarily. Instead, in light of the conflicting certifications, the judge should have afforded the parties the opportunity to conduct discovery, including obtaining expert evaluations. The judge should then "conduct a plenary hearing to assess the credibility of witnesses' testimony, after they have been subjected to rigorous cross examination." R.K., 434 N.J. Super. at 121. Accordingly, we reverse the judge's ruling on plaintiffs' application for joint custody based on a psychological parenthood claim, reinstate the complaint, and remand for a plenary hearing.

Turning to the judge's ruling regarding grandparent visitation, the Grandparent and Sibling Visitation Statute (GVS), N.J.S.A 9:2-7.1, "confers on a child's grandparent . . . standing to file an action for an order compelling visitation," Major v. Maguire, 224 N.J. 1, 13 (2016), and "provides the framework for grandparent . . . visitation when visitation is proven to be 'in the best interests of the child,'" N.J. Div. of Youth & Fam. Servs. v. S.S., 187 N.J. 556, 562 (2006) (quoting N.J.S.A. 9:2-7.1(a)). Still, "the parent's determination whether to permit visitation is entitled to 'special weight,'" Major, 224 N.J. at 15 (quoting Troxel v. Granville, 530 U.S. 57, 67-69 (2000)), and a "grandparent

seeking . . . visitation [under the GVS] must prove by a preponderance of the evidence that denial of [the visitation] would result in harm to the child." Id. at 7 (citing Moriarty v. Bradt, 177 N.J. 84, 117-18 (2003)).  To that end, the grandparent must make "a clear and specific allegation of concrete harm to the children." Daniels v. Daniels, 381 N.J. Super. 286, 294 (App. Div. 2005).

In Slawinski v. Nicholas, 448 N.J. Super. 25 (App. Div. 2016), we described the level of harm a grandparent must demonstrate before a court is required to determine whether visitation is in a child's best interests.  We stated:

> [P]roof of harm involves a greater showing than simply the best interests of the child.  [Moriarty, 177 N.J. at 116] (stating that a dispute between a "fit custodial parent and the child's grandparent is not a contest between equals[,]" consequently "the best interest standard, which is the tiebreaker between fit parents, is inapplicable"). . . .  The harm to the grandchild must be "a particular identifiable harm, specific to the child." Mizrahi v. Cannon, 375 N.J. Super. 221, 234 (App. Div. 2005).  It "generally rests on the existence of an unusually close relationship between the grandparent and the child, or on traumatic circumstances such as a parent's death." [Daniels, 381 N.J. Super. at 294].  By contrast, missed opportunities for creating "happy memories" do not suffice.  Mizrahi, 375 N.J. Super. at 234.  Only after the grandparent vaults the proof-of-harm threshold will the court apply a best-interests analysis to resolve disputes over visitation details. Moriarty, 177 N.J. at 117.
>
> [Slawinski, 448 N.J. Super. at 34 (third alteration in original) (citations omitted).]

15

Accordingly, if a grandparent meets the threshold showing of harm, the best interests standard applies and a trial court should consider the statutory factors pursuant to N.J.S.A. 9:2-7.1(b) to determine whether permitting visitation would be in the child's best interests. Moriarty, 177 N.J. at 117.

Here, the judge denied grandparent visitation under the GVS without plaintiffs having either requested it in their complaint or advocated for it during oral argument. Indeed, a claim of grandparent visitation requires proof of different facts and application of different law from a psychological parenthood claim. We therefore reverse the judge's ruling on grandparent visitation without prejudice to plaintiffs making the application anew.

Plaintiffs seek a remand to a different judge in the Family Part because the judge made credibility findings based on "[d]efendant's [c]ertification." In an abundance of caution, we direct that this matter be assigned to a different judge on remand to avoid the appearance of bias or prejudice. See Entress v. Entress, 376 N.J. Super. 125, 133 (App. Div. 2005) (directing remand "to a different judge for the plenary hearing to avoid the appearance of bias or prejudice based upon the judge's prior involvement with the matter and his expressions of frustration with plaintiff"); N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 617 (1986) ("Because the trial judge has heard this evidence

16

and may have a commitment to its findings, we believe it is best that the case be reconsidered by a new fact-finder.").

In sum, we reverse and remand with directions that the matter be assigned to a different judge for further proceedings consistent with this opinion. We express no opinion as to the ultimate outcome. Given our decision, we need not address the remaining arguments.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION